[No. 18891-1-II. Division Two. November 27, 1996.]

THE STATE OF WASHINGTON, *Appellant*, v. MICHAEL K. DYKSTRA, *Respondent*.

*H. Steward Menefee, Prosecuting Attorney,* and *Joseph F. Wheeler, Deputy,* for appellant.

*Jack B. Micheau* and *Copland & Micheau,* for respondent.

TURNER, J. — Michael Dykstra was charged with pos-

session of marijauna after police escorted him home from a drunk driving arrest, insisted on accompanying him to his back porch and, waiting there until he entered the house, and then, from their vantage point on the porch, observed marijuana on his kitchen counter. The court suppressed all evidence seized from the warrantless search of Dykstra's home. The State now appeals the suppression order. We affirm.

In early October 1993, McCleary Police Officer John Adams received a tip from an informant that Michael Dykstra was growing marijuana in his residence. At around 2 a.m. on October 23, 1993, Officer Adams thought Dykstra was driving while intoxicated and stopped him in his driveway. When Officer Adams called for backup, the Police Chief, Ersal May, was contacted at home and responded. Dykstra was transported from his driveway to the police station for BAC testing and booking. He submitted to breath tests at 3:07 a.m. and 3:09 a.m., and scored a blood alcohol level of .20 on each test.

After citing Dykstra for driving while intoxicated, Officer Adams and Chief May told him they would be taking him home. Dykstra testified that he told the police he did not need a ride home, and that he asked for permission to call his friend Rick to come and get him. They denied him permission. Instead, at approximately 3:30 a.m., Officer Adams and Police Chief May took Dykstra home, intending to release him to the "custody" of his residence.[1] But, they did not merely drop him off. Instead, they exited their vehicles and insisted on accompanying him inside his residence. Chief May told Dykstra: "I know you have marijuana in your house and I am not leaving until you go in the house." Dykstra replied: "you have no right to go in my house. You're uninvited." Dykstra employed several

---

[1]The trial court found this to be unusual. Usually, a person cited for DWI is either taken to the county jail or released at the police station to the custody of a friend or relative. In Officer Adams's two years on the McCleary Police Force, he had transported only one other DWI arrestee back to his residence after booking.

tactics to avoid entry, including stating that he would simply sleep on the back porch. He also attempted to go next door to the neighbors, but the officers stopped him. He even urinated in the driveway rather than go in the house.

When the officers continued to insist that they would not leave until he went inside, Dykstra finally agreed to go in. Officer Adams and Chief May accompanied him onto the three-to-four-foot-wide back porch. Dykstra attempted to keep the door as closed as possible so they could not see inside when he entered; nevertheless, from their vantage point on the porch, both Officer Adams and Chief May testified that they observed what appeared to be a bag of marijuana across the room on the kitchen counter.

Dykstra claims that Chief May then jerked the door open and entered without permission. Chief May disputes this, saying that Dykstra left the door wide open and invited them in. When asked if there was any more marijuana in the house, Dykstra walked into a bedroom, removed eight marijuana plants drying on a rope suspended from the ceiling and turned them over to the officers. Some time later, Chief May produced a "permission to search" form, which Dykstra signed at 3:51 a.m. Dykstra claims that he signed it out of fatigue, anger and frustration, unaware of its contents.

During their search of the residence, officers found additional marijuana and paraphernalia. About 45 minutes after entering the premises, they arrested Dykstra for possession of marijuana in excess of 40 grams and transported him back to the police station, where they informed him of his *Miranda*[2] rights.

Dykstra moved for suppression of evidence seized during the warrantless intrusion into his home. The court granted the motion and entered the following conclusions of law:

> 2. The procedures followed by the officers during the stop

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966).

and arrest of the defendant on DWI charges were proper until the point of transport of the defendant back to his residence.

3. The officers exceeded their caretaking functions, based upon the actions of Dykstra at the time of release, when they accompanied him outside their vehicles, to the door of his residence, and insisted on accompanying him inside his residence.

4. The actions of the officers exceeded the scope of an "open view" by forcing an unnecessary and artificial vantage point.

5. Dykstra's constitutional rights, specifically the right under the Washington State Constitution, article I, section 7 to be free from unreasonable searches and seizures, was violated in this case.

6. All materials seized and statements attributed to Dykstra regarding marijuana or drug usage are derived from the initial illegal search and seizure, and therefore must be excluded.

In light of the trial court's order suppressing critical evidence, the case was dismissed. The State appeals from the court's order suppressing evidence.

█ Findings entered in a CrR 3.6 suppression hearing are reviewed for substantial evidence. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). An appellate court will not independently review the evidence because the trier of fact is in a better position to assess the credibility of witnesses, take evidence, and observe the demeanor of those testifying. *State v. Maxfield*, 125 Wn.2d 378, 385, 886 P.2d 123 (1994).

█ Here, no search warrant allowed entry to Dykstra's home. Warrantless searches are *per se* unreasonable, absent proof by the State that one of the few, narrow exceptions, apply. U.S. CONST. Art. IV; CONST. art. I, § 7.[3] The police contend, however, that the baggie of marijuana they observed inside the kitchen from their vantage point

---

[3]*See State v. Hendrickson*, 129 Wn.2d 61, 70-71, 917 P.2d 563 (1996); *see also State v. Chrisman*, 100 Wn.2d 814, 817, 676 P.2d 419 (1984).

on the porch falls within the "open view" exception to the warrant requirement. Under the open view doctrine no search occurs when a law enforcement officer detects something from a legitimate nonintrusive vantage point.[4] *State v. Myers*, 117 Wn.2d 332, 345, 815 P.2d 761 (1991) (items in defendant's home were in "open view" where police officers approached defendant's home during daylight, by direct access route, spoke with him from the porch, and did not "spy" or act secretive). An officer has the same license to intrude as does a "reasonably respectful citizen."[5] A residential front porch may be considered a lawful vantage point if it is a natural access route to the residence and impliedly open to the public. *State v. Rose*, 128 Wn.2d 388, 391-92, 909 P.2d 280 (1996); *see also, Myers*, 117 Wn.2d at 334.

 *Rose*[6] and other "open view" cases cited above are distinguishable: residential occupants were either on the

---

[4]The "open view" and "plain view" doctrines are similar, and in some instances, the analysis under each is also similar. For example, the Washington Supreme Court recently noted that it was citing cases addressing the "plain view" doctrine as part of its examination of the "open view" doctrine. *Rose*, 128 Wn.2d at 397 n.4.

The "plain view" doctrine differs in that it applies *after* police lawfully intrude into an area in which there is a reasonable expectation of privacy; whereas, the "open view" doctrine applies from a nonintrusive vantage point. *See Myers*, 117 Wn.2d at 345-346.

[5]*State v. Seagull*, 95 Wn.2d 898, 901, 902, 632 P.2d 44 (1981) (slight deviation by officer from most direct route between two doors was not unreasonable intrusion upon privacy). *Compare State v. Daugherty*, 94 Wn.2d 263, 616 P.2d 649 (1980), *cert. denied*, 450 U.S. 958 (1981), where police questioned a suspect outside his residence while another officer walked around a vehicle in the driveway and looked into an obscured garage at the back of the lot. The evidence obtained from the garage was suppressed because, even if the occupant had not been present, his reasonable expectation of privacy in areas not open to the public had been violated.

[6]The Washington State Supreme Court's split decision in *Rose*, 128 Wn.2d 388, reflects its current thinking on the open view doctrine. In *Rose*, police received a tip that marijuana might be found at a certain address. After going to that address and determining that no one was at home, the investigating police officer stood on the front porch and, with the aid of a flashlight, looked through a curtainless window into the defendants' residence. The five-justice majority in *Rose* held that the officer was lawfully on the defendant's front porch and Washington State Constitutional protections were not violated. *Rose*, 128 Wn.2d at 398.

scene and did not object to police presence, or were not at home when police approached. But, the implied invitation to the public present in those cases is absent here. We conclude that the officers were not lawfully on Dykstra's porch; thus the "open view doctrine" does not apply. Dykstra was present on his property and personally made it clear to the officers that he did not want them on his back porch, did not want them to enter his home, and considered their persistence in accompanying him there to be an intrusion into his privacy. Dykstra testified that when Officer Adams transported him back home after his booking for DWI, Chief May followed. They told him to go in the house and said that they would not leave until he went in. According to Dykstra:

> [t]hey just hung around. They wouldn't leave. And I just kept saying, 'I'm not going in my house. You got no business going in my house and I don't have to. I'm home. You released me. I'm here. I'm home. I'm going to sleep on the porch. And they said "No, you are not."

Feeling tired and harassed, Dykstra finally agreed to go inside. He testified that Chief May "[y]anked [the door] right open and stepped in" and that Officer Adams had a look of surprise on his face because he knew the chief had illegally forced his way into the house.

██ The test to determine if a person has a reasonable expectation of privacy under the Fourth Amendment[7] is twofold: (1) Did the person exhibit an actual (subjective) expectation of privacy by seeking to preserve something as private; and (2) Does society recognize that expectation as reasonable? *See Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); *State v. Young*, 123 Wn.2d 173, 189-94, 867 P.2d 593 (1994). Article I, section 7 of the Washington State Constitution says that "[n]o person shall be disturbed in his private affairs, or his home

---

[7]The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

invaded, without authority of law" and provides more protection against government intrusions than does the Fourth Amendment. *State v. Hansen*, 42 Wn. App. 755, 762-63, 714 P.2d 309, *aff'd on other grounds*, 107 Wn.2d 331 (1986). The Washington State Constitution focuses on "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental *trespass* absent a warrant." *State v. Johnson*, 75 Wn. App. 692, 703, 879 P.2d 984 (1994), *review denied*, 126 Wn.2d 1004 (1995) (citations omitted) (quoting *Young*, 123 Wn.2d at 181 (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984))). Noting that "Washington has a long tradition of protecting private property interests from unwanted intrusions," this court held that police unreasonably intruded into the defendants' private affairs when they ignored "no trespassing" and "private property" signs and approached defendants' house via a gated limited access road. *Johnson*, at 702.

■■ Relying on *State v. Seagull*, 95 Wn.2d 898, 632 P.2d 44 (1981), the State contends that a person does not have a legitimate expectation of privacy in impliedly open accessways to a residence.[8] It argues that Officer Adams and Chief May had a right, "as any citizen would, to walk up to the porch, whether that was on the night in question, the day before, or the day after." To say that the public has an implied right, despite the homeowner's protests, to climb onto a back porch at 3 a.m., yank the door out of the homeowner's hand, and enter the dwelling exceeds the bounds of reasonableness. We agree with

---

[8]In *Seagull*, a police officer approached a house in daylight to question the occupants about a bloodstained abandoned vehicle that had been found in the neighborhood. While at the house, the officer saw what he believed to be a marijuana plant growing in a greenhouse on the property. According to *Seagull*, "[i]t is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open." *Seagull*, at 902 (footnote omitted) (citing 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 2.3 (1978)).

*Seagull* interpreted the Fourth Amendment; however, its holding has also been applied in cases involving CONST. art. I, § 7, such as *State v. Vonhof*, 51 Wn. App. 33, 751 P.2d 1221, *review denied*, 111 Wn.2d 1010 (1988), *cert. denied*, 488 U.S. 1008 (1989).

the trial court that Officer Adams and Chief May exceeded their caretaking functions and invaded Dykstra's privacy when they insisted upon exiting their vehicles and accompanying Dykstra inside his residence.[9]

The record contains substantial evidence supporting the trial court's findings. And those findings support the trial court's conclusions. Dykstra's right to be free from unreasonable intrusions, searches, and seizures was violated.

We affirm.

HOUGHTON, A.C.J., and ARMSTRONG, J., concur.

---

[9]In orally reporting its written findings, the trial court said:

"I think . . . you have to look at the totality of the circumstances. . . . And the first thing that I felt to be somewhat unusual is the fact, not necessarily that somebody called out for backup, but that when the chief did arrive and was then involved in the DWI arrest, that he continued to be involved, and maybe that would be normal through the completion of the DWI; but then [the chief and Officer Adams] determined . . . to release this particular defendant to his residence, and that struck me as very unusual on this particular night, after I heard all the evidence, and some of that evidence is that his BAC was a. 20.

". . . It was three a.m. . . . . when they were going to release this particular defendant to his residence . . . . [They] felt this person was totally capable of being released to his residence, . . . [yet] if he was truly fine to be released, [either one or the other] could have driven him to his home. But the two of them drove him to his home.

"[To me, the answer to why all these things are being done] is fairly obvious. They'd received a tip that he had marijuana at his residence and they were very curious and wanted to see inside his residence.

". . . .

"They did not request a warrant by any legal means. I felt that there definitely was pressure on him. He was talking about sleeping on the porch and they wanted him to open the door. . . . [C]ertainly they were going out of their way to see inside his house, and, I believe, to invade his privacy."