1997 ND 241

STATE of North Dakota, Plaintiff and Appellee,

v.

Robert KITCHEN, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Becky FRIEZ, n/k/a Becky Kitchen, Defendant and Appellant.

Criminal Nos. 970085, 970086.

Supreme Court of North Dakota.

Dec. 19, 1997.

As Modified Jan. 20, 1998.

Rehearing Denied Jan. 20, 1998.

Thomas F. Murtha, of Murtha & Murtha, Dickinson, for defendants and appellants.

Tom M. Henning, Assistant State's Attorney, Dickinson, for plaintiff and appellee.

NEUMANN, Justice.

[¶ 1] Becky Lynn (Friez) Kitchen and Robert Kitchen appeal from the trial court's denial of their motion to suppress evidence. We affirm.

I

[¶ 2] On January 19, 1996, Officer Jason Dellwo of the Dickinson Police Department was attempting to locate one Perry Metcalf for service of an arrest warrant. Officer Dellwo checked two other homes in the neighborhood and, after being joined by Officer Jackie Martin, stopped at the home of Robert Kitchen and Becky Friez, n/k/a Becky Kitchen (Becky and Robert have since married). The officers believed Metcalf might be at the Kitchens' home, because they had stopped him earlier while he was using Robert Kitchen's pickup.

[¶ 3] The Kitchens' residence had one entrance, a narrow enclosed entryway with steps leading to an inner door approximately five or six feet away. The outer door was a metal storm/screen door with a large glass window. The outer door did not have a curtain or other window covering, and could only be locked from the inside. The officers could see the inner door from outside the outer door.

[¶ 4] At approximately 5:00 p.m., the officers approached the outer door and rang the doorbell. Officer Dellwo testified he did not hear the doorbell ring. No one answered. After waiting what the trial court determined was a reasonable period of time, the officers, assuming the residents could not hear the doorbell because of loud music coming from the home, entered the enclosed entryway and proceeded down the steps toward the inner door. The parties dispute whether the police officers knocked on the inner door. Becky opened the inner door and met the officers in the entryway. The officers asked Becky about Metcalf. She said she did not know him, but that Robert might. Becky explained Robert was showering, and she went inside to get him.

[¶ 5] When Becky opened the inner door, the officers could smell the odor of marijuana. While she was gone, they talked over the odor and decided they must take action. When Becky returned, they asked her if she had been smoking marijuana. She did not respond and attempted to close the inner door. At this point, the officers secured the premises and prevented Becky from closing the inner door. They waited for another

officer to arrive, after which Officer Dellwo left to obtain a search warrant. Upon obtaining a search warrant, the officers searched the premises and seized marijuana and drug paraphernalia.

[¶ 6] The Kitchens were charged with possession of a controlled substance, marijuana. The Kitchens moved to suppress the evidence obtained from the search, asserting their rights under the Fourth Amendment of the Constitution of the United States had been violated. They argued they had an expectation of privacy in the entryway to their home, and therefore, the officers' obtaining probable cause for a search warrant by smelling the marijuana while in their private entryway violated their right to be secure against unreasonable searches and seizures. After hearing the matter, the trial court denied the motion for suppression of evidence. The Kitchens entered a Rule 11, N.D.R.Crim.P., conditional plea of guilty, reserving their right to appeal.

## II

[¶ 7] The Kitchens contend the entryway to their residence was part of their home, affording them a reasonable expectation of privacy in that area. Based on that expectation of privacy, they argue the officers' warrantless entry into that part of their home, where the officers then smelled marijuana, was an illegal search under the Fourth Amendment, requiring suppression of the evidence gained thereafter.

[¶ 8] We are asked to decide whether the Kitchens had a reasonable expectation of privacy in the enclosed entryway to their home, affording them Fourth Amendment protection.

## III

[¶ 9] The Fourth Amendment to the United States Constitution, made applicable by the Fourteenth Amendment, and Article I, section 8 of the North Dakota Constitution protects individuals from unreasonable searches and seizures. *State v. Winkler,* 552 N.W.2d 347, 351 (N.D.1996). When the government intrudes on an individual's reasonable expectation of privacy, a search is deemed to have occurred. *Id.* The govern-

ment is required to obtain a search warrant before searching an area where an individual possesses a reasonable expectation of privacy, "subject only to a few specifically established and well-delineated exceptions." *Id.* (quoting *Horton v. California,* 496 U.S. 128, 133 n. 4, 110 S.Ct. 2301, 2306 n. 4, 110 L.Ed.2d 112, 120–21 n. 4 (1990) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967))). Absent such an exception, evidence gained in violation of the Fourth Amendment's protections against unreasonable searches and seizures is inadmissible under the exclusionary rule and must be suppressed. *State v. Blumler,* 458 N.W.2d 300, 302 (N.D.1990) (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). Any subsequent evidence gained as a result of the initial illegally acquired evidence is considered "fruit of the poisonous tree," and must likewise be suppressed, unless an exception to the warrant requirement for the search exists. *Id.* (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

[¶ 10] In order for the entryway to the Kitchens' home to be a protected area under the Fourth Amendment, the Kitchens must have a subjective expectation of privacy in their entryway that society would view as objectively reasonable. *State v. Rydberg,* 519 N.W.2d 306, 309 (N.D.1994) (relying on *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), a case in which the United States Supreme Court concluded both subjective and objective expectations are necessary when searching garbage); *see also Katz,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d. at 588, (Harlan, J., concurring) (discussing twofold requirement of subjective expectation of privacy that society recognizes as reasonable).

[¶ 11] We will defer to a trial court's findings of fact in the disposition of a motion to suppress. *State v. Ova,* 539 N.W.2d 857, 858 (N.D.1995). Conflicts in testimony will be resolved in favor of affirmance, as we recognize the trial court is in a superior position to assess credibility of witnesses and weigh the evidence. *Id.* Generally, a trial court's decision to deny a motion to

suppress will not be reversed if there is sufficient competent evidence capable of supporting the trial court's findings, and if its decision is not contrary to the manifest weight of the evidence. *State v. Winkler*, 1997 ND 144, ¶ 8, 567 N.W.2d 330; *City of Fargo v. Thompson*, 520 N.W.2d 578, 581 (N.D.1994). After reviewing the record, we determine the trial court's factual findings are not against the manifest weight of the evidence.

[¶ 12] Whether findings of fact meet a legal standard is a question of law. *Ova*, 539 N.W.2d at 858. While we do not conduct a de novo review of the findings of fact, questions of law are fully reviewable. *Id.* The record reflects the Kitchens asserted their subjective expectation of privacy in the entryway to their home. Whether the Kitchens' expectation of privacy is objectively reasonable will be reviewed de novo. *State v. Carriere*, 545 N.W.2d 773, 775 (N.D.1996). "Whether there is a reasonable expectation of privacy in a given area must be decided on a case-by-case basis." *State v. Edgeberg*, 188 Wis.2d 339, 524 N.W.2d 911, 915 (1994).

[¶ 13] First, the significance of the Kitchens' assertion that the entryway is part of their home cannot be denied. The home is an area constitutionally protected, as "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639, 650 (1980) (citation omitted). In *Payton*, the Supreme Court reiterated the basic principle of Fourth Amendment law that warrantless searches and seizures *inside* a home are presumptively unreasonable. *Id.* at 586, 100 S.Ct. at 1380. However, the Court recognized that evidence left in a public place or in plain view involves no invasion of privacy and the warrantless seizure of such property is presumptively reasonable, assuming law enforcement had probable cause. *Id.* at 586–87, 100 S.Ct. at 1380. *See also Brown v. State*, 75 Md.App. 22, 540 A.2d 143, 149 (1988) (stating the front door area of house is entitled only to extremely limited Fourth Amendment protection because a great amount of privacy cannot be expected where the public was welcome).

[¶ 14] The *Payton* Court defined the area protected inside the home, stating: "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590, 100 S.Ct. at 1382. But, what or where is the threshold to a house? Where should the line be drawn when a house has an enclosed porch, vestibule, or entryway attached to the home? We must look at the reasonableness of each situation, giving due consideration to the particular characteristics of the home in question: "The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706, 713 (1973).

[¶ 15] In assessing the reasonableness of the Kitchens' expectation of privacy, we first consider why law enforcement approached their door. The police went to the Kitchens' residence on legitimate business—attempting to serve a warrant. "[W]hen the police come on to private property ... for some ... legitimate purpose [such as serving an arrest warrant] and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE, § 2.3(f) at 506–08 (3d ed.1996) (footnotes omitted). When officers knock on a door where visitors logically would knock, while engaged in legitimate police activities, they have no less right to be there than any member of the public calling at that home. *State v. Dickerson*, 313 N.W.2d 526, 532 (Iowa 1981); *see also State v. Merrill*, 252 Neb. 510, 563 N.W.2d 340, 344 (1997) (concluding a police officer should not be precluded from observing as an officer what would be observable to him as a private citizen).

[¶ 16] It is clear from the record, the police officers were legitimately attempting to serve a warrant when approaching the Kitchens' home. However, just because a police officer is on legitimate duty, does not give the officer automatic access to a person's property. For example, in *Blumler*, this Court held a

warrantless search in violation of the Fourth Amendment when a deputy entered a closed garage to serve civil process without a warrant. *Blumler*, 458 N.W.2d at 302. The facts in *Blumler* showed the police could have chosen an alternate route to serve the warrant, as the home had at least three outer entrances. *Id.* at 300.

[¶ 17] The situation presented here is distinguishable from *Blumler* in at least two respects. First, in *Blumler*, law enforcement entered an attached garage, not a small attached entryway. *Id.* We have long recognized that a closed garage may be an intimate part of the residence where an owner had a reasonable expectation of privacy. *State v. Manning*, 134 N.W.2d 91, 96 (N.D. 1965); *Lubenow v. N.D. State Highway Comm'r*, 438 N.W.2d 528, 531 (N.D.1989). Second, the officers in *Blumler* chose the garage door instead of a more direct access to the residence, while the officers in the present case had only one access to the Kitchens' residence. *Blumler*, 458 N.W.2d at 302.

[¶ 18] Unlike the garage in *Blumler*, a porch-type entrance may not be afforded the same kind of protection. *See People v. Greene*, 289 Ill.App.3d 796, 224 Ill.Dec. 793, 682 N.E.2d 354, 358 (1997) (holding defendant had a lesser expectation of privacy in his porch than in his house proper, when porch was not used as living area and officers merely entered to knock on inner door). The Washington Supreme Court took an even stronger view, stating: "[A] front porch or normal access to a house is not a constitutionally protected area, and police officers who enter these areas may do so with their eyes open." *State v. Myers*, 117 Wash.2d 332, 815 P.2d 761, 769 (1991). The *Myers* court determined police officers were legitimately on the premises while standing on the front porch of the home, when they had approached in connection with an investigation and where this was the conventional means of access to the home. *Id.*

[¶ 19] Even if the Kitchens had a reasonable expectation of privacy in the entryway to their home, this Court has recognized police, at times, may enter areas where a person may have a reasonable expectation of privacy. *Winkler*, 552 N.W.2d at 352. In *Winkler*, we stated: "[T]his court believes police with legitimate business may enter certain areas surrounding a home where persons may have a reasonable expectation of privacy, such as curtilage, but which are *impliedly open to use by the public.*" *Id.* (emphasis added); *see also State v. Dykstra*, 84 Wash.App. 186, 926 P.2d 929, 932 (1996) (stating: "A residential front porch may be considered a lawful vantage point if it is a natural access route to the residence and impliedly open to the public."). When the officers, in *Winkler*, were investigating a fatal hit and run accident, it was not a Fourth Amendment violation for the police officers to enter the defendant's driveway and look into an open garage, because the officers entered that part of the property as any member of the public would have entered it. *Winkler*, 552 N.W.2d at 352.

[¶ 20] As stated earlier, we give deference to the trial court's finding that the officers entered the home as any member of the public would enter. The trial court found: "[I]t cannot be disputed that the general public typically and commonly entered the residence by the route employed by the police officers." The trial court based this finding in part on testimony of the current occupant of the house, Randolph Schneider. Mr. Schneider's testimony revealed it was not unusual for people to come into the entryway to knock on the inside door, sometimes without even ringing the doorbell first. The trial court also considered Becky's testimony. Becky testified she expected visitors to ring the doorbell and wait outside of the house. She testified that visitors usually waited at the doorbell, however, she also admitted that she considered the entryway a conduit to and from the main door.

[¶ 21] Another case to be considered, though not presented by either party to the trial court is *State v. Crider*, 341 A.2d 1 (Me.1975). The facts presented in *Crider* revealed a police officer on legitimate business entering a defendant's home. *Id.* at 5. The officer knocked on the outer door, but no one answered. *Id.* at 3. "Noticing through the glass in the door that the entryway led

into a hallway, the officer opened the door which was not locked and proceeded inside to an inner door which was closed." *Id.*

[¶ 22] The *Crider* court stated: "The mere presence of a hallway in the *interior* of a single family dwelling, without more, is not in itself an invitation to the public to enter nor a foregoing by the occupants thereof of their expectancy and right of privacy." *Id.* at 4 (emphasis added). "It is not unreasonable for police officers, in the pursuit of criminal investigations, to seek interviews with suspects or witnesses at their homes, but their right to call upon them at their homes for such purposes does not include the right to walk in uninvited merely because there is no response to a knock or a ring." *Id.* Professor LaFave refers to this situation as the "*Crider* rule." LaFave, *supra*, § 2.3(b) at 476.

[¶ 23] In determining the officer's presence was unlawful in the *Crider* case, the Maine Supreme Court considered the following: (1) the officer was discharging a legitimate function; (2) there was no evidence that persistent knocking on the outer door would not have gotten a response; (3) the officer had no reasonable grounds to believe the person with whom he wanted to speak was at that address; and, (4) the hallway was not of the type that could be viewed as reasonably accessible to the public. *Crider*, 341 A.2d at 5.

[¶ 24] The factual scenario in the present case is distinguishable from *Crider*. In both cases, the police officers were on legitimate business. Unlike *Crider*, here, the trial court found that after ringing the doorbell, the police officers waited a reasonable time before entering the outer door to knock at the inner door because they assumed the individuals inside could not hear the doorbell because of the loud music. Also, unlike *Crider*, the officer here had reasonable grounds to believe Perry Metcalf, the person to be served, was at the home of the Kitchens. Lastly, unlike *Crider*, the entryway could be viewed as impliedly open to use by the general public. These distinguishing factors tend to show there was no reasonable expectation of privacy in the entryway. Therefore, the "*Crider*" rule does not apply.

[¶ 25] The Kitchens rely on *State v. Sakellson*, 379 N.W.2d 779 (N.D.1985), to support their proposition that the general public would not enter somebody else's entryway when provided with a doorbell or a place to knock. In *Sakellson*, police officers entered a vestibule and stairway, which was considered private at least in part because of the clothing and personal effects kept there. *Id.* at 782. Like the present case, the officers in *Sakellson* entered through a storm door. *Id.* at 781.

[¶ 26] However, unlike the present case, the facts in *Sakellson* show the officers "proceeded across the porch and through the open *main door*. At no time did they knock, ring the doorbell, or otherwise announce their presence." *Id.* at 781 (emphasis added). We believe the facts are distinguishable from the present case, and, therefore, *Sakellson* has little relevance here.

[¶ 27] In *Edgeberg*, the Wisconsin Court of Appeals held there was no reasonable expectation of privacy in an area when the police entered a porch to knock on an inner door, to investigate a complaint of a barking dog. *Edgeberg*, 524 N.W.2d at 914–15. The porch in *Edgeberg* was described as a vestibule-like addition with a screen door with a lightweight latch, which could be locked from the inside, but was unlocked. *Id.* at 913. This screen door was about six feet from the inside door, which was made of wood. *Id.* The inside door was flush with the original exterior wall of the house. *Id.* The interior of the porch contained a washer and dryer and work clothes. *Id.* Neither door had a doorbell. *Id.*

[¶ 28] In reviewing the evidence presented, we view this case as being similar to *Edgeberg*. Like the porch in *Edgeberg*, the entryway could be described as a vestibule-like addition with a screen (screen/storm) door with a latch, which could be locked from the inside, but was unlocked. Also, as in *Edgeberg*, the screen door in the present case was about six feet from the inside door. While not argued, the pictures on exhibit show the inside door was flush with the original exterior wall of the house, as in *Edgeberg*. The interior of the porch in *Edgeberg* contained a washer and dryer and work clothes, but was

not considered living area. *Id.* Therefore, the fact that the entryway of the Kitchens' home was clean and had a rug is not persuasive that it should be afforded as much privacy as the living area of their home.

[¶ 29] We do not think it unreasonable that the police officers stepped into the entryway of the Kitchens' home to knock at the inner door, after ringing the doorbell and waiting a reasonable period of time, given the fact loud music was playing. Even though the Kitchens subjectively did not expect visitors to enter the unlocked, uncovered storm/screen door on the entryway to their house,[1] it was impliedly open to at least some access by the public.

### IV

[¶ 30] Under the facts presented, we agree with the trial court that the Kitchens' subjective expectation of complete privacy was not objectively reasonable, and therefore not protected by the Fourth Amendment.

[¶ 31] The trial court's decision is affirmed.

[¶ 32] VANDE WALLE, C.J., and MARING AND SANDSTROM, JJ., concur.

MESCHKE, Justice, dissenting.

[¶ 33] The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Section 8 in Article I of our North Dakota Constitution also secures people's houses against unreasonable searches.

[¶ 34] Residents of a house clearly have a justified expectation of privacy against unreasonable intrusion. An unconsented police entry into a home, without a warrant, is an unreasonable search. *See Minnesota v. Olson,* 495 U.S. 91, 98, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990)("To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share."). These constitutional protections extend to "occupants of flimsily constructed dwellings with unobstructed window or other

openings directly on public lands, streets, or sidewalks, who failed to lock their doors to bar entrance." *United States v. Moss,* 963 F.2d 673, 676 (4th Cir.1992). As *State v. Crider,* 341 A.2d 1, 4 (Me.1975), once explained, the "mere presence of a hallway in the interior of a single family dwelling, without more, is not in itself an invitation to the public to enter." Normally, the entryway is an integral part of a home.

[¶ 35] Kitchens lived in a single-family basement home with an attached entryway. The door into the entryway was a metal storm/screen door with a large glass window. The entryway had steps downward to the inner doorway. The window in the outer door was not curtained, but the door was lockable and the only button for a doorbell was there. To me, a lockable door and a doorbell button clearly mark the threshold, the point of entering a home.

[¶ 36] In this case, the officers rang the doorbell, waited momentarily, then opened the unlocked outer door and went into the entryway to knock on the inner door. In my opinion, they crossed the threshold of a private home. Since they had neither consent nor a warrant, I believe their entry was unreasonable, and the evidence they then discovered was unreasonably obtained.

> The officer, at the time of his entry into the hallway, had neither warrant for an arrest or search, nor did he have probable cause for the same. His entry into an integral part of a private dwelling, which in the light of the circumstances of this record could not be viewed as reasonably accessible to the public generally, constituted a trespass.

*Crider,* 341 A.2d at 4–5. Sadly, many an urban resident today must lock their outer door to secure privacy, but I hate to think Dakotans need to do so, yet. Therefore, I respectfully dissent.

[¶ 37] Herbert L. Meschke

---

1. Becky testified on direct when asked by her attorney whether people would usually come into the entryway, "No. They would usually wait at the doorbell." She later testified she could not recall anyone other than Bob entering that way, but it was possible.