2006 ND 44

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Daniel James ANDERSON, Defendant and Appellant.**

**State of North Dakota, Plaintiff and Appellee**

v.

**Jesse Mikal Anderson, Defendant and Appellant.**

**Nos. 20050202, 20050229.**

Supreme Court of North Dakota.

Feb. 23, 2006.

Aaron Grayson Birst, Assistant State's Attorney, Fargo, N.D., for plaintiff and appellee.

Monty Grant Mertz (on brief), Fargo, N.D., for defendant and appellant Daniel James Anderson.

Jesse N. Lange, Larivee & Light, Fargo, N.D., for defendant and appellant Jesse Mikal Anderson.

CROTHERS, Justice.

[¶ 1] Jesse Anderson ("Jesse") and Daniel Anderson ("Daniel") appeal from a criminal conviction for carrying a concealed weapon or dangerous firearm, entered upon a conditional guilty plea after the district court denied their motions to suppress evidence. We affirm, concluding: (1) law enforcement officers had a reasonable and articulable suspicion to stop the vehicle; (2) the officers' actions during the vehicle stop were reasonable; (3) a statement Jesse made to law enforcement officers before being given a *Miranda* warning was not illegally obtained; (4) the search of the vehicle falls within a safety exception to the warrant requirement.

I

[¶ 2] On the evening of February 7, 2005, Gregory Anderson ("Greg") called Barnes County Deputy Joseph Gress regarding Greg's brother, Jesse, and Greg's son, Daniel. When he called Deputy Gress, Greg was in Jamestown, North Dakota. Greg told Deputy Gress he had received a call from Jesse, who was traveling to Fargo, informing Greg of Jesse's plan to settle some bad drug deals in Fargo. Greg told Deputy Gress he believed Jesse was heavily armed, was wearing a bulletproof vest, and was with Daniel. Deputy Gress testified Greg provided him with the information because Greg was worried about Jesse and Daniel's safety and Greg wanted Deputy Gress' help.

[¶ 3] Deputy Gress was familiar with Daniel, Jesse, and Greg through prior investigations as a narcotics officer. Deputy Gress previously had arrested Greg for drug violations. After Greg's arrest, he began voluntarily providing Deputy Gress with information on drug deals. Deputy Gress testified that Greg was very truthful, except for one occasion when he lied about a neighbor selling drugs.

[¶ 4] Deputy Gress knew Jesse was from Kathryn, North Dakota, and Jesse usually drove a green four-door Ford Pickup or an Intrepid. In December 2004, Deputy Gress received information from Jesse's ex-wife, who believed Jesse had a handgun in the console of his pickup and that he often carried an AK–47 rifle. According to Deputy Gress, she had asked Jesse why he carried weapons and Jesse replied, "In case the law tries to fuck with me!"

[¶ 5] Later on February 7, 2005, Deputy Gress received another call from Greg, informing him that Jesse was at a McDonald's or a Stop–N–Go convenience store in north Fargo awaiting further directions to the intended target's residence. Deputy Gress provided the Fargo Police Department with all of his information, and the Fargo Police Department relayed that information to its officers, including Officer Jared Crane.

[¶ 6] Officer Crane observed a green four-door Ford Pickup matching the description of the suspect's vehicle at a McDonald's drive-through in north Fargo. Officer Crane ran a license check on the vehicle and determined the pickup was registered to Hjalmer and Laraine Anderson of Kathryn, North Dakota. Based on his corroboration and the information relayed from Deputy Gress to the Fargo Police Department, Officer Crane testified he believed a high-risk stop was necessary for officer safety.

[¶ 7] After other officers arrived at the scene and the suspect's vehicle had pulled into a parking spot, the vehicle was stopped. Two squad cars blocked the vehicle, and six officers exited their squad cars, positioning themselves around the vehicle with their weapons drawn. Officer Crane instructed the driver, later identified as Jesse, to turn the vehicle off, throw the keys out the window, exit the vehicle, put his hands in the air, and turn around in a 360 degree circle. Officer Crane repeated those commands several times because Jesse was not cooperating. Fargo Police Officer Messmer instructed Jesse to walk backwards toward him. Officer Messmer asked Jesse several times to get on his knees, and eventually Jesse complied. Officer Messmer then instructed Jesse to lay on the ground so the officers could handcuff him. Jesse did not cooperate, and eventually Officer Messmer had to physically put Jesse on the ground. Upon placing his hands on Jesse, Officer Messmer physically determined Jesse was wearing a bulletproof vest. Officer Messmer informed the other officers that Jesse was wearing a bulletproof vest. Once on the ground, Jesse continued to lift his head and chest off the ground, disregarding the officers' instructions. The officers handcuffed Jesse, but told him he was not under arrest. Jesse was advised he was being detained pending investigation and that he was being handcuffed for officer safety. While handcuffing Jesse, but before giving him a *Miranda* warning, Officer Crane asked Jesse if he had any weapons. Jesse stated there was a rifle in the truck. Jesse was then placed in the back of a squad car.

[¶ 8] Another officer repeated the same procedure with Daniel, who fully cooperated with the officer's requests. After officers secured Daniel, Officer Crane testified he was not sure if anyone else was in the vehicle and he asked any other occupants to exit the vehicle. The incident took place at night and the pickup had tinted windows. Officer Crane testified he could not visually determine if anyone else was inside the vehicle. Officer Crane and a second officer approached the passenger side of the vehicle and opened the rear door. Upon opening the door, Officer Crane immediately saw an uncased AK–47 style rifle lying on the floor of the vehicle. He informed the other officers that he had found a weapon. Officer Crane searched the vehicle and seized the rifle, a switch blade, ammunition, a machete, and a 9 millimeter handgun.

[¶ 9] The police took Jesse and Daniel to the police department, where they were given *Miranda* warnings before making statements. Daniel and Jesse were subsequently charged with carrying a concealed firearm or dangerous weapon in violation of N.D.C.C. § 62.1–04–02. They moved to suppress the evidence seized in the parking lot and Jesse's statements, claiming the officers' conduct violated the Fourth and Fifth Amendments of the United States Constitution and N.D. Const. art. I, §§ 8 and 12. The district court denied their motions to suppress, concluding: (1) the officers had a reasonable and articulable suspicion to stop the vehicle; (2) the officers' seizure of Jesse and Daniel was reasonable; (3) a statement by Jesse be-

fore he was given a *Miranda* warning was an officer safety issue and not Fifth Amendment activity; (4) the search of the vehicle was appropriate; and (5) Jesse and Daniel were not under arrest when they were handcuffed and placed in the squad car. Jesse and Daniel conditionally pled guilty to the charge under N.D.R.Crim.P. 11(a)(2), reserving their right to appeal the denial of their motions to suppress.

## II

[¶ 10] When reviewing a district court's denial of a motion to suppress, we defer to the district court's findings of fact. *State v. Kitchen*, 1997 ND 241, ¶ 11, 572 N.W.2d 106. We resolve conflicts in testimony in favor of affirmance, because we recognize the district court is in a better position to assess the credibility of witnesses and weigh the evidence. *Id.* "[A] trial court's decision to deny a motion to suppress will not be reversed if there is sufficient competent evidence capable of supporting the trial court's findings, and if its decision is not contrary to the manifest weight of the evidence." *Id.* Although we defer to the district court's findings of fact, questions of law are fully reviewable. *State v. Linghor*, 2004 ND 224, ¶ 3, 690 N.W.2d 201.

## III

[¶ 11] Jesse and Daniel argue the police officers did not have a reasonable and articulable suspicion to stop their vehicle. They argue the information the officers received from the informants was not sufficient to establish reasonable suspicion to justify the stop of the vehicle.

[¶ 12] In order to legally stop a vehicle, "an officer must have a reasonable and articulable suspicion that the motorist has violated or is violating the law." *State v. Miller*, 510 N.W.2d 638, 640 (N.D.1994). An objective standard is used to determine if an officer has reasonable suspicion to make an investigatory stop. *State v. Bryl*, 477 N.W.2d 814, 816 (N.D.1991). " 'The question is whether or not a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in criminal activity.' " *Id.* (quoting *State v. Lykken*, 406 N.W.2d 664, 666 (N.D.1987)). The determination of whether the facts in a case support a reasonable and articulable suspicion is fully reviewable on appeal. *State v. Smith*, 2005 ND 21, ¶ 11, 691 N.W.2d 203.

[¶ 13] Information from an informant may provide the factual basis to establish reasonable suspicion for an investigatory stop. *Miller*, 510 N.W.2d at 640. In evaluating the factual basis for an investigatory stop, we must consider the totality of the circumstances, including the quantity, or content, and quality, or degree of reliability, of the officer's information. *Id.* "As a general rule, the lesser the quality or reliability of the tip, the greater the quantity of information required to raise a reasonable suspicion." *Id.*

[¶ 14] Jesse and Daniel argue the information provided to law enforcement was insufficient to establish a reasonable and articulable suspicion because Greg Anderson is a member of the "criminal milieu" and therefore the information he provided was not reliable.

[¶ 15] A member of the "criminal milieu" is someone "who is himself involved in criminal activity or is, at least, someone who enjoys the confidence of criminals." *State v. Dahl*, 440 N.W.2d 716, 718 (N.D.1989). The reliability of an informant who is a member of the "criminal milieu" must be established. *Id.* Unlike information provided by a citizen informant, the information provided by a member of the criminal milieu is not pre-

sumed reliable. *Id.* Reliability may be established in a number of ways, including corroboration through independent investigation. *See State v. Ochoa,* 2004 ND 43, ¶ 13, 675 N.W.2d 161. A citizen informant is " 'someone who volunteer[s] information, [does] not want anything in return for the information, and [is] not at risk or in fear of going to jail.' " *State v. Roth,* 2004 ND 23, ¶ 10, 674 N.W.2d 495 (quoting *State v. Rangeloff,* 1998 ND 135, ¶ 4 n. 3, 580 N.W.2d 593). Information provided by a citizen informant is presumed reliable. *Id.*

[¶ 16] We conclude it is unnecessary to determine whether Greg is a citizen informant or a member of criminal milieu because it does not influence the outcome of the case. *See Trinity Medical Center, Inc. v. Rubbelke,* 389 N.W.2d 805, 807 n. 3 (N.D.1986) (unnecessary to address issues that do not influence the outcome of the case).

[¶ 17] Greg's information has a higher indicia of reliability because he was a known informant who voluntarily gave Deputy Gress information on prior occasions. Deputy Gress testified that, except for the one occasion, Greg was always truthful. The information Greg gave in this case also had a higher indicia of reliability because Greg was in Jamestown and the information involved events in Fargo, which Officer Crane verified. Greg volunteered the information knowing his son, Daniel, could be arrested if law enforcement learned about Jesse and Daniel's plan. Greg contacted Deputy Gress because he was worried about Jesse and Daniel's safety and he wanted Deputy Gress' help. Greg did not ask for anything in exchange for the information, and he was not at risk of going to jail in connection with this incident.

[¶ 18] We also recognize some of the information came from multiple sources, further increasing its reliability. Jesse's ex-wife is a citizen informant, and the information she provided about Jesse carrying a handgun in his pickup and an AK–47 is presumed reliable. The information Deputy Gress provided is also presumed reliable because it was based on his personal knowledge of Jesse and Daniel.

[¶ 19] Deputy Gress provided his information to the Fargo Police Department, which relayed all the information to the Fargo Police Officers, including Officer Crane. Officer Crane verified that a green four-door Ford Pickup was located at a particular location in north Fargo and that the pickup was registered to someone with the same last name from the same small town as Jesse. Officer Crane corroborated enough information provided by the informants to reasonably believe the vehicle belonged to Jesse and Jesse was involved in criminal activity.

[¶ 20] Under the totality of the circumstances, we conclude the officers had a reasonable and articulable suspicion to justify an investigatory stop of the vehicle.

## IV

[¶ 21] Jesse and Daniel argue even if the police officers had a reasonable and articulable suspicion to stop their vehicle, the investigatory stop immediately became an arrest when officers ordered them out of the vehicle at gunpoint, ordered them to lie on the ground, handcuffed them, and placed them in the back of a squad car. They argue the officers did not have probable cause to arrest them and any evidence seized as a result of that unlawful arrest must be suppressed.

[¶ 22] The Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, and N.D. Const. art. 1, § 8 guarantees "[t]he right of people to be secure in their persons, houses, papers and

effects, against unreasonable searches and seizures." An arrest occurs when "circumstances existed that would have caused a reasonable person to conclude he was under arrest and not free to leave." *State v. Linghor*, 2004 ND 224, ¶ 14, 690 N.W.2d 201. A court looks at the totality of the circumstances in determining whether an arrest occurred. *Id.*

[¶ 23] The existence of an arrest is a question of law, fully reviewable on appeal. *City of Wahpeton v. Johnson*, 303 N.W.2d 565, 567 (N.D.1981). There is no bright line rule for determining when a seizure becomes a defacto arrest. *State v. Heitzmann*, 2001 ND 136, ¶ 18, 632 N.W.2d 1. A seizure occurs "whenever an officer stops an individual and restrains his freedom, and that seizure must be reasonable." *Id.* at ¶ 9. In determining if a seizure is reasonable, we must "balanc[e] the public interest with the individual's right to personal security free from arbitrary interference by police officers." *Id.* One important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion is the invasion of the individual's Fourth Amendment interests. *Id.* at ¶ 18. But we must also consider the law enforcement purposes served by the stop and the time needed to achieve those purposes. *Id.* Officer safety is a legitimate and weighty interest, which also must be considered when determining if a seizure is reasonable. *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

[¶ 24] In the context of an investigatory stop, this Court has applied a reasonableness balancing test and concluded:

[t]he right to make an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, and the test of

reasonableness under the Fourth amendment requires careful attention to the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting the seizure or attempting to evade the seizure by flight.

*Heitzmann*, 2001 ND 136, ¶ 18, 632 N.W.2d 1. It is "unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio*, 392 U.S. 1, 23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Officers are entitled to use forcible means "reasonably necessary to protect their personal safety and to maintain the status quo" to achieve the purpose of the stop. *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

[¶ 25] The totality of the circumstances in this case lead us to the conclusion the officers took reasonable safety precautions and conducted an investigatory stop rather than a defacto arrest. The police officers had information that Jesse and Daniel were "heavily armed" and on their way to a known drug dealer's home to settle the score over a bad drug deal. Based on reliable information they received from informants, the officers also believed Jesse was wearing a bulletproof vest and he had weapons for use if he encountered trouble with law enforcement. Under these circumstances, the officers' fear for their personal safety was reasonable and justified the safety precautions used to remove Jesse and Daniel from the vehicle.

[¶ 26] After Jesse got out of the vehicle, he actively resisted law enforcement, which required Officer Messmer to physically place Jesse on the ground. When Officer Messmer determined Jesse was wearing a bulletproof vest, the officers had verified a significant portion of the information provided to them by the infor-

mants. The verified information and the suspect's non-cooperative nature justified the continued escalation of the safety precautions. Although the intrusion on Jesse's and Daniel's personal liberty was significant, it was brief and did not outweigh significant public policy concerns for the safety of police officers and members of the public.

[¶ 27] Other courts have reached a similar conclusion under similar facts, and our application of the Fourth Amendment's reasonableness standard in this case is consistent with its application in other jurisdictions. *See Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir.2004) (officers' actions in drawing their weapons, using backup officers, handcuffing the suspect and placing the suspect in the back of the squad car, did not amount to a defacto arrest because officers had information that the suspect was armed and a violent crime could soon occur); *United States v. Tilmon*, 19 F.3d 1221, 1226–28 (7th Cir.1994) (investigatory stop did not evolve into an arrest when officers blocked the suspect's vehicle, had their weapons drawn, ordered the suspect to exit the vehicle and to lie face down on the shoulder of the road, the suspect was handcuffed and placed in the back of the squad car); *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (officers' actions constituted an investigatory stop rather than an arrest without probable cause when officers stopped a vehicle, ordered the suspects out at gun point, and forced them to lie face down on the wet pavement).

[¶ 28] We conclude the officers seizure of Jesse and Daniel in the parking lot was reasonable and did not amount to a defacto arrest.

V

[¶ 29] Jesse argues the statement he made to Officers Crane and Mess-

mer in the McDonald's parking lot was illegally obtained because the officers had not given him a *Miranda* warning. He argues the statement was made during a custodial interrogation. Jesse also claims his subsequent statement at the police station was illegally obtained, because any *Miranda* warning given after the initial statement was ineffective.

[¶ 30] The Fifth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, and N.D. Const. art. 1, § 12 require that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." Exculpatory or inculpatory statements resulting from a custodial interrogation may not be used as evidence against the individual who made the statements unless procedural safeguards, such as a *Miranda* warning, are used to secure the privilege against self-incrimination. *State v. Fasching*, 453 N.W.2d 761, 762–63 (N.D.1990). Custodial interrogation is " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Connery*, 441 N.W.2d 651, 654 (N.D.1989) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

[¶ 31] Public safety is one exception to the general requirement for a *Miranda* warning. *New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. An officer may question someone in custody without first giving a *Miranda* warning, if the answer to the question is necessary to secure officer safety or the safety of the

public. *Id.* at 658–59, 104 S.Ct. 2626. The question must not be designed solely to elicit testimonial evidence from the person. *Id.*

[¶ 32] Before giving Jesse a *Miranda* warning, Officer Crane testified that he asked Jesse if he had a weapon. Jesse replied that there was a weapon in the vehicle. Officer Crane did not ask Jesse if he had a weapon for the purpose of collecting evidence; rather, Officer Crane questioned Jesse for purposes of officer and public safety. We conclude Jesse's statement in the parking lot falls within the public safety exception to *Miranda* and is admissible. We further conclude his subsequent statement at the police station after a *Miranda* warning is also admissible.

## VI

[¶ 33] Jesse and Daniel argue the evidence seized during the search of the vehicle should be suppressed because the search was a warrantless search that did not fall within a recognized exception to the warrant requirement.

[¶ 34] The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures. A warrantless search is unreasonable under the Fourth Amendment unless it falls within a recognized exception to the warrant requirement. *State v. Tognotti*, 2003 ND 99, ¶ 7, 663 N.W.2d 642. Officer safety is a recognized exception to the warrant requirement. *State v. Haverluk*, 2000 ND 178, ¶¶ 20–24, 617 N.W.2d 652.

[¶ 35] In this case, a search of the vehicle was necessary to determine if there were other occupants in the vehicle, and therefore was a valid search under the officer safety exception to the warrant requirement. *Cf. New York v. Class*, 475 U.S. 106, 114–19, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (public safety exception applies to warrantless search of vehicle for VIN); *Maryland v. Buie*, 494 U.S. 325, 332–35, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (warrantless search of home for individuals when officers have reasonable belief there may be individuals posing a danger to officers); *Haverluk*, 2000 ND 178, ¶¶ 20–24, 617 N.W.2d 652 (public safety exception and warrantless search of vehicle for weapon).

[¶ 36] In *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir.1997), the Fourth Circuit Court of Appeals held that if a vehicle's heavily tinted windows prevent officers from seeing the interior of the vehicle, an officer may open at least one of the vehicle's doors and visually inspect the vehicle's interior to determine if the driver is armed or has access to weapons, or if there are other occupants of the vehicle that may pose a danger to the officers. The court found a contrary holding would be irreconcilable and would undermine case law recognizing the importance of protecting officer safety. *Id.* (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

[¶ 37] Officer Crane testified that after Jesse and Daniel were ordered out of the vehicle, he could not see inside the pickup to determine if there were any other occupants. The incident occurred at night, and the pickup had tinted windows and sat high off the ground. When the potential danger to officers and the public is weighed against the minor intrusion on the individual's privacy interest, safety outweighs the individual's interest. Under these circumstances, Jesse and Daniel's right to be free from unreasonable search was not infringed when the officers opened the door of the vehicle to determine if

there were any other occupants in the vehicle. We conclude the search was reasonable.

[¶ 38] Upon opening the door, Officer Crane immediately saw an uncased AK–47 style rifle lying on the floor, in plain view. An uncased rifle of this type is a violation of a Fargo ordinance. Fargo Municipal Code § 10–0304. At that point, the officers had probable cause to arrest Jesse and Daniel and seizure of the evidence was incident to a lawful arrest. *See State v. Bartelson*, 2005 ND 172, ¶ 17, 704 N.W.2d 824.

## VII

[¶ 39] Sufficient evidence supports the district court's findings, and its decision is not contrary to the manifest weight of the evidence. We conclude the trial court did not err in denying Jesse and Daniel's motions to suppress, and we affirm the convictions.

[¶ 40] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ, concur.