Filed 12/14/04 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2004 ND 224

State of North Dakota, Plaintiff and Appellee

v.

Matthew Linghor, Defendant and Appellant

No. 20030360

Appeal from the District Court of Williams County, Northwest Judicial District, the Honorable Gerald H. Rustad, Judge.

AFFIRMED.

Opinion of the Court by VandeWalle, Chief Justice.

Nicole E. Foster, State’s Attorney, P.O. Box 2047, Williston, ND 58802-2047, for plaintiff and appellee.

Kevin J. Chapman, Chapman Law Office, P.O. Box 1920, Williston, ND 58802-1920, for defendant and appellant.

State v. Linghor

No. 20030360

VandeWalle, Chief Justice.

[¶1] Matthew Linghor appealed from a jury conviction for conspiracy to manufacture a controlled substance - methamphetamine, a class A felony.  Linghor claims evidence discovered during a traffic stop should have been suppressed and that the State’s retrial of his case violated the prohibition against double jeopardy.  We affirm Linghor’s conviction.

[¶2] Williams County Deputy Sheriff Terry Sherven made a traffic stop of an automobile in which Matthew Linghor was a passenger.  Deputy Sherven detected an odor of anhydrous ammonia coming from the automobile and, in plain view in the backseat, saw what he determined to be paraphernalia used to make drugs.  Deputy Sherven called for assistance.  While waiting for assistance to arrive, Deputy Sherven questioned the driver of the automobile, William Ostwald.  Ostwald indicated a can of paint thinner, which was part of the alleged drug paraphernalia located in the backseat, belonged to Linghor.  Although the record is not entirely clear, it appears Ostwald made this statement outside of Linghor’s presence.  Deputy James Borseth and Special Agent Steven Gutknecht responded to Deputy Sherven’s request for assistance.  Special Agent Gutknecht viewed the interior of the car, determined that a mobile methamphetamine lab was present, and instructed Deputy Sherven to arrest Ostwald, who had been placed in Deputy Sherven’s automobile.  As it was cold outside, Special Agent Gutknecht decided to tow the automobile to a law enforcement garage for a thorough search.  Deputy Sherven removed Linghor from the automobile.  Special Agent Gutknecht performed a quick examination of the automobile’s interior, but he ceased this activity to focus on Deputy Sherven’s search of Linghor.  Following a pat-down search, which did not reveal the presence of a weapon, Deputy Sherven had Linghor empty his pockets.  Linghor removed a Wal-Mart receipt from his pocket and the officers noted that items on the receipt, which could be used to manufacture methamphetamine, were present in the automobile.  The officers handcuffed Linghor, placed him in Deputy Borseth’s automobile, and read him his Miranda rights.  While waiting for the tow truck, Special Agent Gutknecht interviewed Ostwald and Linghor and both allegedly confirmed that Linghor purchased certain items listed on the Wal-Mart receipt.  These interviews occurred before Linghor’s formal arrest, which Special Agent Gutknecht ordered during his comprehensive search of the automobile at the law enforcement center.  This formal arrest occurred approximately 20 minutes after discovery of the Wal-Mart receipt.  At trial, Linghor asked the district court judge to suppress the Wal-Mart receipt and his statements in which he admitted purchasing items on the Wal-Mart receipt found in the automobile, but the trial judge denied the request.  The State introduced this evidence at trial.  Linghor’s trial resulted in a hung jury and a mistrial.  The State tried Linghor again and the second trial, which contained an additional State’s witness who resolved factual inconsistencies in the State’s case, resulted in a conviction.

I.

[¶3] The standard of review for a trial court’s denial of a suppression motion is well-established.  This Court has stated:

We will defer to a trial court’s findings of fact in the disposition of a motion to suppress.  Conflicts in testimony will be resolved in favor of affirmance, as we recognize the trial court is in a superior position to assess credibility of witnesses and weigh the evidence.  Generally, a trial court’s decision to deny a motion to suppress will not be reversed if there is sufficient competent evidence capable of supporting the trial court’s findings, and if its decision is not contrary to the manifest weight of the evidence.

State v. Kitchen
, 1997 ND 241, ¶ 11, 572 N.W.2d 106 (internal citations omitted).  “While we defer to the trial court’s findings of fact, questions of law are fully reviewable.”  
State v. Hawley
, 540 N.W.2d 390, 392 (N.D. 1995).

A.

[¶4] The Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, and Art. I, § 8 of the North Dakota Constitution, protect individuals from unreasonable searches and seizures.  
State v. Boline
, 1998 ND 67, ¶ 19, 575 N.W.2d 906.  To realize this protection of individual rights, all evidence obtained by unreasonable searches and seizures is inadmissible against the defendant at trial.  
Mapp v. Ohio
, 367 U.S. 643 (1961) (applying the exclusionary rule to state courts); 
see also
 
State v. Handtmann
, 437 N.W.2d 830, 837 (N.D. 1989) (“The fruit-of-the-poisonous-tree doctrine is an extension of the exclusionary rule and prohibits the indirect use of information obtained in illegal searches and seizures.”).  A warrantless search is unreasonable unless it falls within a recognized exception to the warrant requirement.  
State v. Kunkel
, 455 N.W.2d 208, 209-10 (N.D. 1990).

[¶5] A search incident to a valid custodial arrest is one exception to the warrant requirement, and the U.S. Supreme Court defined the scope of this exception in 
Chimel v. California
, 395 U.S. 752, 763 (1969) (holding that an officer making a lawful custodial arrest may search the arrestee and the area within the arrestee’s immediate control).  In certain circumstances, a search can even precede an arrest.  
State v. Overby
, 1999 ND 47, ¶ 8, 590 N.W.2d 703.  Where the search precedes arrest, however, it must be shown that (1) probable cause to arrest existed before the search, and (2) the arrest and search were substantially contemporaneous.  
Id.
 (citing 
Rawlings v. Kentucky
, 448 U.S. 98, 111 (1980)).  Another exception to the warrant requirement is the doctrine of inevitable discovery.  
State v. Phelps
, 297 N.W.2d 769, 774 (N.D. 1980).  The inevitable-discovery exception establishes that evidence derived from an unlawful search is not inadmissible under the fruit-of-the-poisonous-tree doctrine if it is shown the evidence would have been uncovered without the unlawful action.  
Id.

B.

[¶6] Linghor asserts probable cause to arrest must be particularized with respect to each person arrested and that a person’s mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search a person.  Linghor contends his presence in the automobile, which he did not own, was not enough for law enforcement to suspect him of criminal activity or search his person.  Linghor asserts the pocket search was not conducted incident to his arrest.  He argues the police had no probable cause to arrest him until they uncovered the Wal-Mart receipt, and the fruits of this illegal search cannot retroactively provide the probable cause to arrest him.  Linghor notes the 20 minute delay between the discovery of the Wal-Mart receipt and his formal arrest, which allegedly allowed police time to compare the items on the receipt with the items in the automobile, and argues it highlights the lack of pre-search probable cause to arrest.  Linghor also takes issue with the district court’s determination that he was under arrest at the time of the pocket search.  Finally, Linghor labels as fruit of the poisonous tree his statements in which he allegedly admitted purchasing certain items from the Wal-Mart receipt.  The State counters that the search of Linghor’s person was valid under two exceptions to the warrant requirement for searches and seizures, the search-incident-to-arrest exception where the search precedes the arrest and the inevitable-discovery doctrine.

C.

[¶7] We conclude the officers had probable cause to arrest Linghor at the time of the pocket search and, when viewed objectively, had placed Linghor under arrest by the time of the search.  Deputy Sherven’s search is therefore justified as a search performed incident to Linghor’s arrest.

[¶8] Under North Dakota law an officer is authorized to arrest a person, without a warrant, for a public offense committed or attempted in the officer’s presence; when the person arrested has committed a felony, although not in the officer’s presence; and when a felony in fact has been committed and the officer has reasonable cause to believe the person arrested to have committed it.  N.D.C.C. § 29-06-15(1)(a-c).  Upon seeing the methamphetamine paraphernalia in plain view in the automobile, the officers had probable cause to believe that some drug-related crime was either committed or attempted.  Therefore, this statute, either as a whole or in part, provided the officers with the requisite authority to arrest the responsible parties without first obtaining a warrant.  The primary question is whether officers had probable cause to believe Linghor committed this crime.

[¶9] The case of 
Maryland v. Pringle
, 124 S. Ct. 795 (2003), is dispositive of this issue.  In 
Pringle
, a police officer stopped an automobile for speeding and obtained the driver’s consent to search the car.  
Id.
 at 798.  The car had three occupants.  
Id.
  The search revealed the presence of a large amount of cash in the glovebox and five plastic baggies containing cocaine behind the back-seat armrest.  
Id.
  Pringle was a front-seat passenger in the car.  
Id.
  None of the automobile occupants admitted ownership of the drugs and all three were arrested.  
Id.
  The Maryland Court of Appeals held that, “absent specific facts tending to show Pringle’s knowledge and dominion or control over the drugs, ‘the mere finding of cocaine in the back armrest when [Pringle] was a front seat passenger in a car being driven by its owner is insufficient to establish probable cause for an arrest for possession.’”  
Id.
 at 799 (quoting 
Pringle v. Maryland
, 805 A.2d 1016, 1027 (Md. 2002)).  The U.S. Supreme Court unanimously rejected this line of reasoning, which is nearly identical to that advanced by Linghor.

[¶10] The Supreme Court stated:

The long-prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community’s protection.  On many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules.

The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.  We have stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized.

Id.
 at 799-800 (internal citations and quotations omitted).  Further, “[i]n assessing whether there is probable cause to arrest, police officers need not have knowledge or facts sufficient to establish guilt [at trial], only knowledge that would give a prudent person reasonable grounds to believe an offense has been or is being committed.”  
State v. Overby
, 1999 ND 47, ¶ 13, 590 N.W.2d 703 (citing 
Torstenson v. Moore
, 1997 ND 159, ¶ 17, 567 N.W.2d 622).  The Supreme Court in 
Pringle
 concluded, “[t]o determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.”  
Pringle
, 124 S. Ct. at 800.

[¶11] Turning to the specific facts in 
Pringle
, the Supreme Court stated:

We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine.  Thus a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.

Pringle’s attempt to characterize this case as a guilt-by-association case is unavailing.  His reliance on [
Ybarra v. Illinois
, 444 U.S. 85 (1979)] is misplaced.  In 
Ybarra
, police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance.  Upon entering the tavern, the officers conducted patdown searches of the customers present in the tavern, including Ybarra.  Inside a cigarette pack retrieved from Ybarra’s pocket, an officer found six tinfoil packets containing heroin.  We stated:

 

“[A] person’s mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.  
Sibron v. New York
, 392 U.S. 40, 62-63, [20 L. Ed. 2d 917, 88 S. Ct. 1889] (1968).  Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.  This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.” 444 U.S., at 91, 62 L. Ed. 2d 238, 100 S. Ct. 338.

We held that the search warrant did not permit body searches of all of the tavern's patrons and that the police could not pat down the patrons for weapons, absent individualized suspicion.  
Id.
, at 92, 62 L. Ed. 2d 238, 100 S. Ct. 338.

This case is quite different from 
Ybarra
[.]  Pringle and his two companions were in a relatively small automobile, not a public tavern.  In 
Wyoming v. Houghton
, 526 U.S. 295, 143 L. Ed. 2d 408, 119 S. Ct. 1297 (1999), we noted that “a car passenger--unlike the unwitting tavern patron in 
Ybarra
--will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.”  
Id.
, at 304-305, 143 L. Ed. 2d 408, 119 S. Ct. 1297.  Here we think it was reasonable for the officer to infer a common enterprise among the three men.  The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

Pringle
, 124 S. Ct. at 800-01.

[¶12] Linghor’s situation is indistinguishable from 
Pringle
.  The facts that do serve to distinguish Linghor’s case from 
Pringle
 strengthen the finding that probable cause to arrest Linghor existed.  The drug-paraphernalia evidence in this case was far larger than the cash and drugs discovered in 
Pringle
.  The smell of anhydrous ammonia emanating from the automobile was immediately noticeable to Deputy Sherven standing outside the car.  Both of these facts indicate Linghor “had knowledge of, and exercised dominion and control over, the [drug paraphernalia].  Thus a reasonable officer could conclude that there was probable cause to believe [Linghor] committed the crime of possession of [drug paraphernalia relating to methamphetamine], either solely or jointly.”

[¶13] In addition, upon being stopped by Deputy Sherven, and before the search of Linghor’s pocket, Ostwald indicated that a can of paint thinner located in the backseat belonged to Linghor.  Although this statement came in the form of an explanation meant to exculpate both Ostwald and Linghor, a reasonable police officer could nonetheless view such a statement as an indication that Linghor played some role in supplying the components to the underlying drug offense.  Ostwald’s statement, while not critical to validating the officers’ conduct, nonetheless provided probable cause to believe Linghor was involved in a conspiracy to manufacture methamphetamine.  In contrast to the silence exhibited in 
Pringle
, Ostwald’s statement regarding Linghor’s ownership of the paint thinner buttresses our determination that probable cause to arrest Linghor existed.  Therefore, it is objectively reasonable to infer a “common enterprise” between Ostwald and Linghor and we find Linghor’s “guilt-by-

association” defense untenable.

[¶14] Was Linghor in fact under arrest at the time of the pocket search?  “The existence of an arrest is a question of law.”  
City of Wahpeton v. Johnson
, 303 N.W.2d 565, 567 (N.D. 1981).  “An arrest is made by an actual restraint of the person of the defendant, or by his submission to the custody of the person making the arrest.”  N.D.C.C. § 29-06-09.  On appeal, much was made of the fact that Linghor was not “formally” placed under arrest until approximately 20 minutes after the pocket search.  Indeed, Special Agent Gutknecht testified Linghor was simply being detained before the time of his formal arrest.  However, an officer’s subjective intent or outward statements do not necessarily control whether, or when, a party is under arrest.  
See
 
Stansbury v. California
, 511 U.S. 318, 322-25 (1994) (discussing the custody determination for Miranda purposes and its relationship to an arrest).  Rather, we objectively examine the totality of the circumstances to determine whether an arrest occurred.  
Id.
  As we have stated, “formal words of arrest are not a condition precedent to the existence of an arrest.”  
State v. Anderson
, 336 N.W.2d 634, 639 (N.D. 1983).  Stated differently, an arrest can occur before an officer formally informs a suspect he is under arrest.  The proper, objective test asks whether circumstances existed that would have caused a reasonable person to conclude he was under arrest and not free to leave.  
Wishnatsky v. Bergquist
, 550 N.W.2d 394, 398 (N.D. 1996).  The benefit of taking such determinations out of the subjective or discretionary realms and placing them on objective ground is obvious.  Without such a protection of individual rights, for example, the police would be free to relentlessly question a suspect without first informing him of his constitutional rights, all by delaying the “magic words” that would trigger a custodial arrest.  
See generally
 
Yarborough v. Alvarado
, 124 S. Ct. 2140, 2147-49 (2004) (applying an objective, reasonable-person test for custody); 
Miranda v. Arizona
, 384 U.S. 436, 455-58 (1966) (recognizing the role of warnings in reducing the likelihood suspects will fall victim to constitutionally impermissible practices of police interrogation in coercive, custodial environments).

[¶15] Here, we believe a reasonable person in Linghor’s situation would have concluded he was under arrest when he was removed from the automobile by Deputy Sherven, if not earlier.  We do not believe a reasonable person, found in an automobile smelling of anhydrous ammonia with an abundance of drug paraphernalia in plain sight, would feel free to exit the car, much less leave the crime scene.  This fact is reinforced by the presence of three officers on the scene.  Further, Special Agent Gutknecht actually stopped searching the automobile to observe Linghor when he was removed from the car.  The presence of these three officers, two of whom were exclusively focused on Linghor as he was removed from the vehicle, would cause a reasonable person to conclude he was not free to leave.

[¶16] In any event, it is apparent Linghor was under arrest well before being formally informed of such at the law enforcement center.  After the Wal-Mart receipt was discovered, Linghor was almost immediately placed in handcuffs, taken to Deputy Borseth’s automobile, and read his Miranda rights.  Here, the facts similar to those in the 
Pringle
 decision highlight the abundance of probable cause to arrest that existed before the search of Linghor’s person.  The absolute restraint of Linghor’s movement that occurred immediately after the pocket search, coupled with the knowledge that a search can precede an arrest and still be valid, reinforces our holding.  
See
 
Rawlings v. Kentucky
, 448 U.S. 98, 111 (1980).

[¶17] The officers had probable cause to arrest Linghor prior to the pocket search and had restrained his freedom of movement upon removing him from the automobile, if not before, and the search of Linghor’s person is appropriate as a search incident to arrest.  Finally, the evidence in the record, which was not contested on appeal, is that Linghor’s incriminating statements regarding the Wal-Mart receipt were made after he knowingly, intelligently, and voluntarily waived his Miranda rights.  The search that produced the receipt was legal.  The statements derived from the search cannot be excluded as fruit of the poisonous tree and were properly admitted at trial.

II.

[¶18] Linghor argues his conviction from the second trial should be overturned on double-jeopardy grounds because the district court erred in declaring a hung jury and a mistrial in the first case.  He points out the jury only deliberated approximately two-and-a-half hours before declaring itself hung and argues the jury should have been required to continue to deliberate, even if it meant coming back for a second day.  Also, Linghor notes the jury could not reach agreement on relatively simple factual questions as to which there were inconsistencies in the State’s case.  For example, the jury was confused about the discrepancy between the product identification number on a can of paint thinner introduced into evidence and the number listed on a corresponding True Value receipt found on Linghor’s person.  Linghor finds fault with the State being allowed to add a new witness at the second trial, the manager of True Value, who explained the discrepancy between the identification numbers on the can of paint thinner and the True Value receipt.  Linghor believes this amendment gave the State a second chance to try their case, free from the errors and oversights that resulted in a hung jury in the first trial.  Contending the State commenced the first trial without sufficient evidence to convict, Linghor submits they should not have been afforded a second opportunity to accomplish their aim. These errors, he argues, denied him the opportunity to have his future decided by the first jury, a body Linghor believes likely would have found him not guilty.

A.

[¶19] Section 29-01-07, N.D.C.C., provides:

No person can be twice put in jeopardy for the same offense, nor can any person be subjected to a second prosecution for a public offense for which he has once been prosecuted and convicted, or acquitted, or put in jeopardy, except as is provided by law for new trials.

N.D. Const. art. I, § 12 states, in part, “[n]o person shall be twice put in jeopardy for the same offense.”  And, finally, the Fifth Amendment to the United States Constitution provides, in part, “nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb.”  The double-jeopardy prohibition of the Fifth Amendment is applicable to the States through the Fourteenth Amendment.  
Benton v. Maryland
, 395 U.S. 784 (1969).  The North Dakota statutory and constitutional double-jeopardy provisions should be read so as to afford protections consistent with the Fifth Amendment to the U.S. Constitution.  
State v. Allesi
, 216 N.W.2d 805, 817-18 (N.D. 1974).

[¶20] “The general rule is that a person is put in jeopardy when his trial commences, which in a jury case occurs when the jury is empaneled and sworn, and in a non-jury trial when the court begins to hear evidence.”  
State v. Berger
, 235 N.W.2d 254, 257 (N.D. 1975); 
see also
 
Allesi
, 216 N.W.2d at 813 (discussing 
United States v. Jorn
, 400 U.S. 470, 479-80 (1971); 
Green v. United States
, 355 U.S. 184, 188 (1957); 
Wade v. Hunter
, 336 U.S. 684, 688 (1949)).  “But in cases in which a mistrial has been declared prior to verdict, the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial.”  
Illinois v. Somerville
, 410 U.S. 458, 467 (1973).  “[The Double Jeopardy Clause] does not prohibit retrial in every instance when the first trial has terminated prior to a verdict.”  
Allesi
, 216 N.W.2d at 814.  The U.S. Supreme Court has also stated:

The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment.  Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed.

Wade v. Hunter
, 336 U.S. at 688-89.  Each case in which a double-jeopardy violation is asserted must turn upon its own facts, 
Downum v. United States
, 372 U.S. 734, 737 (1963), and the U.S. Supreme Court has “disparaged rigid, mechanical rules in the interpretation of the Double Jeopardy Clause.”  
Serfass v. United States
, 420 U.S. 377, 390 (1975) (internal quotations omitted).

[¶21] The landmark decision construing the Double Jeopardy Clause in the mistrial context is 
United States v. Perez
, 22 U.S. 579, 580 (1824).  The U.S. Supreme Court stated:

We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.  They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.  To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner.  But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

Id.
  Thus, manifest necessity and the ends of public justice are the basic controlling principles in determining whether a mistrial was properly granted so that a defendant may be retried.  
Berger
, 235 N.W.2d at 259.

[¶22] The U.S. Supreme Court subsequently underscored the breadth of a trial judge’s discretion to declare a mistrial.

[The 
Perez
] formulation, consistently adhered to by this Court in subsequent decisions, abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial.  The broad discretion reserved to the trial judge in such circumstances has been consistently reiterated in decisions of this Court.

Somerville
, 410 U.S. at 462.  In 
Gori v. United States
, 367 U.S. 364, 368 (1961), the U.S. Supreme Court further stated:

Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant’s consent and even over his objection, and he may be retried consistently with the Fifth Amendment.

Although the U.S. Supreme Court has held that “[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached,” 
Somerville
, 410 U.S. at 464, the Supreme Court has also recognized the seriousness of the trial judge’s decision, stating:

The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one.  Nor will the lack of demonstrable additional prejudice preclude the defendant’s invocation of the double jeopardy bar in the absence of some important countervailing interest of proper judicial administration.

Id.
 at 471.

B.

[¶23] On appeal, Linghor relied heavily on the U.S. Supreme Court opinion in 
Downum v. United States
, 372 U.S. 734 (1963).  As the Supreme Court subsequently summarized 
Downum
:

In 
Downum v. United States
, the defendant was charged with six counts of mail theft, and forging and uttering stolen checks.  A jury was selected and sworn in the morning, and instructed to return that afternoon.  When the jury returned, the Government moved for the discharge of the jury on the ground that a key prosecution witness, for two of the six counts against defendant, was not present.  The prosecution knew, prior to the selection and swearing of the jury, that this witness could not be found and had not been served with a subpoena.  The trial judge discharged the jury over the defendant’s motions to dismiss two counts for failure to prosecute and to continue the other four.  This Court, in reversing the convictions on the ground of double jeopardy, emphasized that “each case must turn on its facts,” 372 U.S., at 737, and held that the second prosecution constituted double jeopardy, because the absence of the witness and the reason therefor did not there justify, in terms of “manifest necessity,” the declaration of a mistrial.

Somerville
, 410 U.S. at 464-65.  The 
Downum
 Court’s rationale is that, “in the absence of sufficient evidence to convict, the district attorney cannot by any act of his deprive the defendant of the benefit of the constitutional provision prohibiting a person from being twice put in jeopardy for the same offense.”  
Cornero v. United States
, 48 F.2d 69, 71 (9th Cir. 1931) (opinion extensively quoted in 
Downum
).  Linghor analogizes that the prosecutor in his case empaneled the first jury without possessing sufficient evidence to convict, namely the True Value manager who was able to resolve the inconsistency between the product identification number on the can of paint thinner and the corresponding number on the True Value receipt.  The first jury explicitly cited this inconsistency as a central, divisive issue in its response to the court’s request for a written list of matters hindering the jury’s progress.

[¶24] The 
Downum
 case is distinguishable from Linghor’s situation.  In 
Downum
, the prosecutor empaneled the jury without sufficient evidence to convict and then explicitly sought to “rectify” this mistake by having the jury discharged.   Linghor argues the State proceeded at the first trial with insufficient evidence to convict, thus triggering the dismissal.  But, Linghor’s argument could be made in any case in which a jury was unable to reach a unanimous decision.  What is critical is what, if anything, the State did during the trial to trigger a dismissal.  Here, the State took no action to force a dismissal.

[¶25] Mistrials will frequently result because of confusion over the evidence presented.  Here, in contrast with many mistrial situations, the State was able to pinpoint what piece of evidence seemed to confound the first jury.  Armed with this knowledge, the State took steps to address this deficiency in the second trial.  Although these steps presumably aided the State, this is not the type of benefit that implicates the Double Jeopardy Clause.  In every case, the State must make decisions about what evidence to present to the jury.  Mistakes will inevitably be made.  Whether the State knew of the discrepancy regarding the can of paint thinner, thought the distinction unimportant, or believed they could explain the inconsistency through other evidence is irrelevant.  The State empaneled a jury, tried their case, and was willing to let the first jury decide Linghor’s fate.  That the first jury was unable to reach a unanimous verdict does not automatically lead to a double-jeopardy bar.  As 
Downum
 itself described, “it has been agreed that there are occasions when a second trial may be had although the jury impaneled for the first trial was discharged without reaching a verdict and without the defendant’s consent.  The classic example is a mistrial because the jury is unable to agree.”  
Downum
, 372 U.S. at 735-36.

[¶26] We cannot conclude the trial judge abused his discretion in finding the first jury hung and declaring a mistrial.  Trial judges must both encourage a jury to work diligently to reach a verdict, yet not push the jury to a point where their decision will no longer be the product of an impartial deliberative process.  Although we refrain from attempting to quantify these delicate decisions, the rather short length of deliberation that occurred in this case raises concerns.  Nonetheless, the record reveals the trial judge in Linghor’s case struggled with these issues and spent considerable time discussing available options with the attorneys involved.  The trial judge inquired into the divisive issues stymying the jury’s progress and took a poll of the jurors to determine whether they thought a verdict could be reached, to which eleven jurors said they could not reach a verdict.  Given the depth of this division and the resultant threat it posed to an impartial verdict, the trial judge acted within the confines of his discretion, manifest necessity, and the ends of public justice in declaring a mistrial.

[¶27] We affirm Linghor’s conviction.

[¶28] Gerald W. VandeWalle, C.J.

Carol Ronning Kapsner

Dale V. Sandstrom

William A. Neumann

 I Concur in the Result.

   Mary Muehlen Maring