2006 ND 82

**In the Interest of P.F.**

**Cynthia M. Feland, Petitioner and Appellee,**

v.

**P.F., Respondent and Appellant.**

No. 20050302.

Supreme Court of North Dakota.

April 19, 2006.

Rehearing Denied May 11, 2006.

Kent M. Morrow, Bismarck, N.D., for respondent and appellant.

Cynthia M. Feland, Assistant State's Attorney, Bismarck, N.D., for petitioner and appellee.

CROTHERS, Justice.

[¶ 1] P.F. appeals from an order committing him to the care, custody, and control of the executive director of the North Dakota Department of Human Services for treatment as a sexually dangerous individual. On appeal, P.F. argues the district court had insufficient grounds for finding probable cause at the preliminary hearing. Additionally, he argues the final commitment hearing was not timely held and clear and convincing evidence did not exist to show P.F. was a sexually dangerous individual. We conclude probable cause was properly found, a proper extension was granted for the hearing, and the order was supported by the evidence. Therefore, we affirm.

I

[¶ 2] P.F. has a history of sexual- and alcohol-related convictions and incidents stemming back to his youth. His adult criminal record includes four convictions, one later overturned, involving sexually predatory conduct. The first conviction was an October 1990 sexual assault, in which P.F. forced a woman against a wall, put her hand on his groin, fondled her, and rubbed his pelvis against hers. The second and third convictions were in 1994 and 2001 for criminal trespass. The 1994 conviction arose when P.F. went, uninvited, into the house of a woman twice in one evening, the second time falling onto her while she was asleep in her bed. The 2001 conviction followed after an acquaintance of P.F.'s found him crawling outside her bedroom in the middle of the night after he "wandered into" the house. In 2004, P.F. was convicted for gross sexual imposition after he allegedly digitally penetrated

an acquaintance while she was sleeping. That conviction was overturned on procedural grounds by the district court and affirmed by this Court.

[¶ 3] At the preliminary hearing, P.F.'s parole officer testified to utilizing the information from P.F.'s criminal record, as well as from interviews with P.F. and P.F.'s girlfriend, to rate him on the MNSOST–R. The test revealed a high likelihood of recidivism. Finding probable cause to believe P.F. was a sexually dangerous individual, the district court ordered P.F.'s commitment in the State Hospital for sixty days.

[¶ 4] On June 10, 2005, fifty-six days after the preliminary hearing, the State Hospital sent a request for an extension due to scheduling constraints with the evaluating psychiatric experts. P.F. moved to dismiss on June 15, 2005. The district court granted an extension on June 15, 2005, the sixty-first day of P.F.'s commitment, and ordered his release in the interim. The district court ordered the commitment hearing be held "as soon as possible after the 15th day of July, 2005." A full commitment hearing was held on July 19, 2005, and the order of commitment was issued on August 16, 2005.

[¶ 5] The standard of review for appeals from commitments of sexually dangerous individuals is a modified clearly erroneous standard. *In re D.V.A.*, 2004 ND 57, ¶ 7, 676 N.W.2d 776. We affirm the district court's commitment order unless it is induced by an erroneous view of the law or we are firmly convinced the order is not supported by clear and convincing evidence. *Id.*

II

[¶ 6] P.F. argues probable cause was found improperly at the preliminary hearing because the parole officer was not an "expert" and no showing was made that P.F. had a sexual, personality, or mental disorder.

[¶ 7] A preliminary hearing must be held within seventy-two hours of the filing of the petition for commitment of a sexually dangerous individual. N.D.C.C. § 25–03.3–11. The preliminary hearing is held to determine whether there is probable cause to believe the individual is sexually dangerous. If the court so finds, it shall "order that the respondent be transferred to an appropriate treatment facility for an evaluation as to whether the respondent has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction." *Id.* There is no requirement that such a showing of mental disease or defect be made at the preliminary hearing, nor is expert testimony required. *Id.*

[¶ 8] In *State v. Linghor*, we explained "probable cause" generally, adopting the United States Supreme Court's reasoning:

The long–prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community's protection. On many occasions, we have reiterated that the probable–cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

The probable–cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality

of the circumstances. We have stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized.

2004 ND 224, ¶ 10, 690 N.W.2d 201 (quoting *Maryland v. Pringle*, 540 U.S. 366, 370–71, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)). Even though *Linghor* discusses probable cause in the criminal context, the explanation is consistent with our interpretation of the probable cause requirement under N.D.C.C. § 25–03.3–11. No specific, named evidence is required in order to make a probable cause finding; rather, a court must take a practical approach, looking at all evidence brought before it, to determine whether there is a reasonable ground to believe a person may be sexually dangerous.

[¶ 9] We conclude the district court did not err by finding probable cause.

### III

[¶ 10] Within sixty days after the finding of probable cause, a commitment hearing must be held to determine whether an individual is, in fact, sexually dangerous. N.D.C.C. § 25–03.3–13. The court may extend the sixty-day time limitation if good cause is shown. *Id.*

[¶ 11] Here, the State Hospital sent a letter to the district court on the fifty-sixth day of P.F.'s commitment, requesting an extension. On the sixtieth day, P.F. filed a motion to dismiss. The district court ordered an extension on the sixty-first day of P.F.'s commitment. P.F. argues the extension was error because the district court did not appropriately find "good cause" and did not order the extension until the sixty-day period had expired. We disagree.

[¶ 12] The district court has discretion to grant extensions "for good cause." N.D.C.C. § 25–03.3–13. Here, the State Hospital issued a letter to the district court indicating its inability to complete the psychiatric assessments due to scheduling constraints, and an extension was requested. No formal motion was made by the State. Following P.F.'s motion to dismiss and a hearing on both the dismissal and the extension, the district court granted the extension, stating, "[T]here is good cause for extending the time of [the] hearing." The court ordered P.F.'s release in the interim.

[¶ 13] Although we discourage direct communications between the State Hospital and the court, based on this record we cannot say the district court abused its discretion in acting upon the letter request. We anticipate that future communications with the court will be handled by use of proper motion practice to ensure notice to all parties, timely handling by the court, and adequate assembly and preservation of the record for review by this Court if necessary.

[¶ 14] We are also concerned with the State's view that scheduling problems at the State Hospital result in an automatic, acceptable showing of good cause. The State relies on *In re M.D.*, 1999 ND 160, 598 N.W.2d 799, in making this sweeping argument. In *In re M.D.*, we stated that in civil commitments, "this Court has upheld extensions of the time for hearing because of scheduling problems in the district court's calendar or illness of an expert witness who had evaluated the committed person." *Id.* at ¶ 15. We affirmed the district court's order of extension in *In re M.D.* because the psychiatrist had been unable to complete his evaluation and the State's attorney handling the case had been ill and out of the office for two weeks.

[¶ 15] We are mindful of the time and budgetary constraints present at the State Hospital, but we are not persuaded that "Sorry, too busy" is an automatic "out" every time a sexually dangerous individual assessment is not or will not be made within the sixty-day statutory time limitation. Although *In re M.D.* continues to stand for the proposition that, in certain situations, time constraints or a person's unavailability may give rise to "good cause," *In re M.D.* does not stand for the proposition that scheduling can be used as an automatic excuse for failure to timely conduct the commitment hearing. 1999 ND 160, ¶ 15, 598 N.W.2d 799.

[¶ 16] An order of commitment normally results in a significant deprivation of liberty. Due to that deprivation, the legislature has established a sixty-day evaluation period and, absent a showing of good cause, the courts, the State, and the State Hospital must abide by that mandate. Here, we find any delay was harmless because P.F. was released between the order granting the extension and the final order of commitment. However, we strongly urge all involved in this process to be mindful of the statutory requirements in the future.

[¶ 17] Section 25–03.3–13, N.D.C.C., does not require that a motion for an extension be made within the original statutory period. *In re M.D.*, 1999 ND 160, ¶ 16, 598 N.W.2d 799. As such, we will not require that a district court issue its order within the statutory period. We would expect a court to grant or deny an extension in a prompt manner; however, we cannot conclude based on the record before us that a request for an extension made within the sixty days and an order granting such extension issued five days later was an abuse of discretion. Therefore, we conclude the extension was timely requested and granted.

IV

[¶ 18] P.F. argues the district court erred in concluding P.F. was a sexually dangerous individual. He relies primarily on an assertion that it was inappropriate for the evaluating psychologists to consider P.F.'s criminal trespass charges and his reversed gross sexual imposition conviction when making their assessments. We disagree, concluding neither the psychologists nor the district court deviated from the commitment statutes.

[¶ 19] Under N.D.C.C. § 25–03.3–13, the State has the burden to show by clear and convincing evidence that a defendant is a sexually dangerous individual. A "sexually dangerous individual" is defined as a person who has "engaged in sexually predatory conduct and who has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct." N.D.C.C. § 25–03.3–01(8). We have concluded that to satisfy N.D.C.C. § 25–03.3–13, the State must produce two experts to independently establish that the respondent has some sort of disorder and that the disorder makes him or her "likely to engage in further acts of sexually predatory conduct." *In re M.B.K.*, 2002 ND 25, ¶ 11, 639 N.W.2d 473.

[¶ 20] Here, the evaluating psychologists testified they had taken into account P.F.'s sexual assault conviction as well as the two criminal trespass convictions and overturned gross sexual imposition conviction. P.F. argues consideration of these latter three offenses was improper because two are not "sexual offenses" by definition and the other was overturned. However, P.F. provides no support for his contention that these should have been

excluded from consideration. The State argues that under the commitment statutes, "sexually dangerous conduct" includes all conduct of a sexually predatory nature, not just that which results in a successful conviction. We agree.

[¶ 21] Words within a statute are to be interpreted in their ordinary sense. N.D.C.C. § 1–02–02. *Webster's New World Dictionary* defines conduct as "the way that one acts; behavior." (2d ed.1980). There is no suggestion that "conduct" is synonymous with "convictions." Therefore, we hold that all sexually predatory conduct, including conduct that did not result in a charge or conviction, may be considered under a Section 25–03.3–01(8), N.D.C.C., analysis. Here, the other three offenses involved sexually predatory conduct. The circumstances surrounding both criminal trespass convictions involved P.F. lurking, uninvited, in or around a woman's bedroom in the middle of the night. The gross sexual imposition conviction was overturned on procedural grounds, but the alleged victim in that case testified extensively about P.F.'s conduct. All of these incidents could legitimately be considered sexually predatory conduct and were appropriately considered by the evaluating psychologists.

[¶ 22] P.F. also raises an argument about the various diagnostic tools and assessment tests, such as the RRASOR and Static–99, used by the evaluating psychologists. He essentially asks the Court to examine the raw scores yielded by these tests to determine whether P.F. is "likely to re-offend." We decline the opportunity to second-guess the psychiatric experts used in these evaluations. The raw scores provided through diagnostic tools should not overshadow the ultimate diagnoses and opinions of the expert witnesses. The respondent should engage his or her own expert to attack the State's evidence, rath-

er than asking this Court or the district court to conduct independent analyses of the raw test results.

[¶ 23] P.F. meets the definition of a "sexually dangerous individual" under N.D.C.C. § 25–03.3–01(8). He has a history of sexually predatory conduct and numerous mental diseases that made him likely to re-offend. We hold the State carried its burden to show by clear and convincing evidence that P.F. is a sexually dangerous individual.

V

[¶ 24] We affirm the district court's order of commitment.

[¶ 25] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and DALE V. SANDSTROM, JJ., concur.

KAPSNER, Justice, concurring.

[¶ 26] I concur in the majority opinion except for ¶ 22. I write separately for two reasons: to underscore the necessity of reading the constitutional requirements set forth in *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) into our statute and to reiterate that diagnostic tools and assessment tests do not act as substitutes for judicial review.

[¶ 27] In order to involuntarily commit a sexually dangerous individual under our statute, there must be a finding an individual has committed some type of sexually predatory conduct and is diagnosable with some type of personality, sexual, or mental disorder that makes an individual "likely to engage in further acts of sexually predatory conduct." N.D.C.C. § 25–03.3–01(8). We have said "likely to engage in further acts of sexually predatory conduct" means the individual's "propensity towards sexual violence is of such a degree as to pose a threat to others." *In re G.R.H.*, 2006 ND 56, ¶ 16, 711 N.W.2d 587. As enunciated

by the majority in *G.R.H.*, at ¶ 18, our civil commitment statute must be read in light of *Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002). Thus, an individual must also have a "serious difficulty in controlling behavior." *Id.; see also G.R.H.*, at ¶ 18 (construing civil commitment statute to avoid possible constitutional infirmity). Otherwise, civil commitment could quickly become a " 'mechanism for retribution or general deterrence'— functions properly those of criminal law, not civil commitment." *Crane*, 534 U.S. at 412, 122 S.Ct. 867 (citing *Kansas v. Hendricks*, 521 U.S. 346, 372–73, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (Kennedy, J., concurring)).

[¶ 28] Before an individual can be civilly committed as a sexually dangerous individual, there must be a showing of: (1) sexually predatory conduct; (2) some type of congenital or acquired condition manifested by a personality, sexual, or mental disorder that makes an individual "likely to engage in further acts of sexually predatory conduct" meaning the individual's propensity towards sexual violence is of such a degree as to pose a threat to others; and (3) the individual must have a serious difficulty in controlling behavior. Because of the way petitioner has framed his issues, the Court does not address the third part of the requirement. This may give the impression our statute can be read in a constitutional vacuum. *G.R.H.* foreclosed such a reading. *G.R.H.*, at ¶ 18.

[¶ 29] Also, I am concerned ¶ 22 of the majority opinion could erroneously be read to imply diagnostic tools and assessment tests used on sex offenders—such as the Static–99 or RRASOR—can act as a substitute for judicial decision making. We have previously made clear that we will not engage in a "contest over percentage points" when it comes to determining whether an individual meets the requirements for civil commitment. *In re M.B.K.*, 2002 ND 25, ¶ 18, 639 N.W.2d 473. Instead, we require a thorough examination done by experts to make the initial recommendation of whether an individual poses a threat to society. *Id.* A certain test score on the RRASOR or Static–99 does not make an individual automatically committable. If we were to accept such logic, the judiciary would be without purpose. The court has the ultimate decision to determine whether the State has met its burden of producing clear and convincing evidence sufficient for commitment. A psychological test cannot act as a substitute for independent judicial review.

[¶ 30] To the extent the majority opinion is read in the proper light, I agree.

[¶ 31] CAROL RONNING KAPSNER.