# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

2019 ND 125

In the Matter of J.M.

Julie A. Lawyer, Burleigh County
State's Attorney,                                           Petitioner and Appellee

    v.

J.M.,                                                       Respondent and Appellant

No. 20180278

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable David E. Reich, Judge.

REVERSED.

Opinion of the Court by VandeWalle, Chief Justice.

Julie A. Lawyer, Burleigh County State's Attorney, Bismarck, ND, petitioner and appellee.

Tyler J. Morrow, Grand Forks, ND, for respondent and appellant.

**Matter of J.M.**

**No. 20180278**

**VandeWalle, Chief Justice.**

[¶1]    J.M. appealed from a district court order denying his petition for discharge and continuing his commitment as a sexually dangerous individual. He argues the State did not prove by clear and convincing evidence his antisocial personality disorder and sexual disorder were likely to result in a serious difficulty in controlling his behavior. On this record we conclude the State did not establish clear and convincing evidence of a nexus between J.M.'s disorder and his sexual dangerousness to others. We reverse.

I

[¶2]    J.M. was civilly committed as a sexually dangerous individual in October 2005 at the end of his incarceration for a 2001 conviction for gross sexual imposition involving a nine-year-old victim. J.M. has unsuccessfully petitioned for discharge several times and has appealed his commitment on four prior occasions. *See Interest of J.M.*, 2006 ND 96, 713 N.W.2d 518; *Matter of J.M.*, 2011 ND 105, 799 N.W.2d 406; *In re J.M.*, 2013 ND 11, 826 N.W.2d 315; *In re J.M.*, 2014 ND 118, 859 N.W.2d 929.

[¶3]    In this case, J.M. filed a petition for discharge in June 2017. At the December 1, 2017 hearing, the district court heard testimony from the State Hospital's expert, Dr. Byrne, and J.M.'s independent evaluator, Dr. Benson. In his testimony, Dr. Byrne stated J.M. was likely to engage in further acts of sexually predatory conduct based on actuarial tests and his review of J.M.'s records. Dr. Byrne also found J.M.'s diagnoses are linked to a serious difficulty in controlling his behavior. During her testimony, Dr. Benson testified J.M. was not likely to engage in sexually predatory conduct and no longer met the criteria for a sexually dangerous individual. Dr. Benson

1

based her testimony on interviews with J.M. and his family, actuarial tests, and dynamic factors.

[¶4]     The district court also received testimony about an incident where J.M. threw a rock at another resident and an altercation with another resident investigated by the State Hospital. The experts disagreed on what these incidents represented about J.M.'s likelihood to engage in further acts of sexually predatory conduct. However, both Dr. Byrne and Dr. Benson stated that aggression remained an issue for J.M. Additionally, the court received evidence of behavioral write-ups J.M. received for writing negative comments about other residents in his journal and withdrawing twelve dollars more than he was allowed to from the ATM. Nothing in the record suggests J.M. did anything inappropriate with the money.

[¶5]     Quoting from Dr. Byrne's report, the district court found J.M. continues to be a sexually dangerous individual under N.D.C.C. ch. 25-03.3 and denied J.M.'s application for discharge.

II

[¶6]     Civil commitments of sexually dangerous individuals are reviewed under a modified clearly erroneous standard. *In Interest of Tanner*, 2017 ND 153, ¶ 4, 897 N.W.2d 901. This Court will affirm a district court's order denying a petition for discharge unless it is induced by an erroneous view of the law or this Court is firmly convinced it is not supported by clear and convincing evidence. *Id*. This Court gives "great deference to the court's credibility determinations of expert witnesses and the weight to be given their testimony." *Id.* In cases of conflicting testimony, the district court is the best credibility evaluator. *In re Hehn*, 2008 ND 36, ¶ 23, 745 N.W.2d 631.

[¶7]     When a committed individual petitions for discharge, the State must prove by clear and convincing evidence the petitioner is still a sexually dangerous individual. N.D.C.C. § 25-03.3-18(4). The State must prove three statutory elements to show the petitioner remains a sexually dangerous individual:

> [1] [the individual] engaged in sexually predatory conduct and [2] has a congenital or acquired condition that is manifested by a sexual

2

disorder, a personality disorder, or other mental disorder or dysfunction [3] that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.

N.D.C.C. § 25-03.3-01(8).

[¶8] The State must also meet substantive due process requirements by proving the individual has serious difficulty in controlling his behavior. *Tanner*, 2017 ND 153, ¶ 5, 897 N.W.2d 901. Consistent with the United States Supreme Court ruling in *Kansas v. Crane*, 534 U.S. 407 (2002), we interpret the definition of a sexually dangerous individual to require "proof of a nexus between the requisite disorder and dangerousness to encompass proof that the disorder involves serious difficulty in controlling behavior and suffices to distinguish a dangerous sexual offender whose disorder subjects him to civil commitment from the dangerous but typical recidivist in the ordinary criminal case." *Interest of Carter*, 2019 ND 67, ¶ 4, 924 N.W.2d 112. Neither our case law, nor *Kansas v. Crane*, "require the conduct evidencing the individual's serious difficulty in controlling his behavior to be sexual in nature." *In re Wolff*, 2011 ND 76, ¶ 7, 796 N.W.2d 644.

[¶9] Constitutional considerations require a causal connection between the disorder and the lack of control which would likely result in future sexually predatory conduct. *Tanner*, 2017 ND 153, ¶ 5, 897 N.W.2d 901. Non-sexual conduct demonstrating an individual's serious difficulty in controlling behavior may also be considered. *Id*. at ¶ 5. However, "[t]he presence of a mental disorder or condition alone does not constitute clear and convincing evidence an individual is likely to engage in further acts of sexually predatory conduct." *In Interest of Nelson*, 2017 ND 152, ¶ 7, 896 N.W.2d 923. "The description of the characteristics of such mental disorder also does not alone constitute proof of serious difficulty in controlling behavior." *Id*. "The evidence must clearly show the antisocial personality disorder is likely to manifest itself in a serious difficulty in controlling sexually predatory behavior." *J.M.*, 2006 ND 96, ¶ 10, 713 N.W.2d 518.

3

[¶10] The district court must find the State has proven all elements by clear and convincing evidence. *In re Johnson*, 2016 ND 29, ¶ 4, 876 N.W.2d 25. In its order, the court must state the specific factual findings upon which its legal conclusions are based. *Id*. "The court errs, as a matter of law, when its findings are insufficient or do not support its legal conclusions." *Id*.

[¶11] J.M. concedes the State met its burden on the first two prongs of N.D.C.C. § 25-03.3-01(8). Under the first prong of N.D.C.C. § 25-03.3-01(8), the district court took judicial notice of J.M.'s prior convictions of Corruption of a Minor against a 15 year old girl in 1998 and Gross Sexual Imposition against a 9 year old girl in 2001. *See J.M.*, 2006 ND 96, ¶ 2, 713 N.W.2d 518. The court also found clear and convincing evidence J.M. suffers from a sexual disorder, though the experts differed on their specific diagnoses.

[¶12] On appeal, J.M. contends the State failed to prove by clear and convincing evidence that he is likely to engage in further acts of sexually predatory conduct and has serious difficulty controlling his behavior. "We have recognized the phrase 'likely to engage in further acts of sexually predatory conduct' under N.D.C.C. § 25-03.3-01(8), means the individual's propensity towards sexual violence is of such a degree as to pose a threat to others." *Tanner*, 2017 ND 153, ¶ 6, 897 N.W.2d 901 (quoting *Matter of Rubey*, 2011 ND 165, ¶ 5, 801 N.W.2d 702).

[¶13] In addressing the third prong in its order, the district court recognized the improvements J.M. made in treatment but found J.M. is likely to engage in further acts of sexually predatory conduct and has serious difficulty controlling his behavior. The court based its findings on actuarial tests administered by both Dr. Byrne and Dr. Benson, Dr. Byrne's testimony on J.M.'s sexual disorder, and dynamic factors considered in Dr. Byrne's report. Those dynamic factors included an incident of J.M. throwing a rock at another State Hospital resident and an altercation with a resident that led to J.M. being temporarily moved to the hospital's most secure unit. In its findings, the court specifically identified the numerous actuarial tests performed by

both experts which placed J.M. in above average, well above average, or high risk categories for reoffending.

[¶14] This Court "defer[s] to a district court's determination that an individual has serious difficulty controlling behavior when it is supported by specific findings demonstrating the difficulty." *Johnson*, 2016 ND 29, ¶ 5, 876 N.W.2d 25. The State bears the burden of showing the risk posed by J.M. is distinguishable "from the dangerous but typical recidivist in the ordinary criminal case" by clear and convincing evidence. *Wolff*, 2011 ND 76, ¶ 7, 796 N.W.2d 644. Here, the district court's order did not provide specific findings demonstrating J.M. is any more dangerous than other released convicts. J.M.'s scores on actuarial tests are not enough to require J.M.'s continued commitment. "A certain test score . . . does not make an individual automatically commitable." *Hehn*, 2008 ND 36, ¶ 21, 745 N.W.2d 631 (quoting *Interest of P.F.*, 2006 ND 82, ¶ 29, 712 N.W.2d 610). "A psychological test cannot act as a substitute for independent judicial review." *Id*.

[¶15] The district court also found a nexus existed between J.M.'s disorder and a difficulty controlling his behavior based on J.M.'s diagnosis, Dr. Byrne's report, and dynamic factors. In its order, the court quoted Dr. Byrne's report where he discussed J.M.'s disorder and his ability to manage his risk and control his behavior. Dr. Byrne stated J.M. "continues to demonstrate 'serious difficulty' controlling his behavior that would likely be worse in less restrictive environment [sic]." The court built on Dr. Byrne's report by discussing the two dynamic factors considered by both experts. First, the court discussed the State Hospital moving J.M. to the most secure unit while staff investigated an altercation between him and another resident. Dr. Benson testified that the State Hospital cleared J.M. of any wrongdoing in the altercation, but Dr. Byrne could not testify on the outcome because it had not been included in the records he reviewed. The court also addressed the incident in which J.M. threw a rock at another resident. Dr. Byrne and Dr. Benson differed on whether the incident was "horseplay," but both found aggression remained an issue for J.M.

[¶16]   Though the disciplinary incidents considered by the court were not of a sexual nature, the court stated it could look at all behavior in determining whether a person has a serious difficulty controlling their behavior. While the court may rely on actions that are non-sexual in nature, "[t]he evidence must clearly show . . . a serious difficulty in controlling sexually predatory behavior." *J.M.*, 2006 ND 96, ¶ 10, 713 N.W.2d 518. The limited rule infractions relied on in this case do not establish the necessary connection between J.M.'s disorder and his likelihood of sexually reoffending.

[¶17]   In *Carter*, we upheld a district court's order denying discharge from civil commitment where Carter had multiple incidences of rule violations and possessed materials containing images of prepubescent children. 2019 ND 67, ¶ 16, 924 N.W.2d 112. In *Tanner*, we upheld a court's determination regarding sexual dangerousness based on "general rule violations and instances where Tanner acted out sexually" since his last review.  2017 ND 153, ¶ 10, 897 N.W.2d 901. We also upheld a court's determination that an individual was sexually dangerous where, since the last evaluation, the individual acted inappropriately toward hospital staff, violated rules of his treatment program, made minimal progress in sex offender treatment, showed no empathy for his victims, and had psychopathic traits. *Wolff*, 2011 ND 76, ¶ 9, 796 N.W.2d 644. Similarly, this Court upheld a district court's determination of sexual dangerousness where both experts found a nexus between the individual's disorder and sexual offenses and the court's order included detailed findings discussing the facts it relied upon in making its decision. *In re Rush*, 2009 ND 102, ¶ 12, 766 N.W.2d 720.

[¶18]   In *Nelson*, we reversed a district court's denial of a petition for discharge that was based on a report that relied heavily on an individual's long-term history, with little about his recent past. 2017 ND 152, ¶ 9, 896 N.W.2d 923. Here, much of Dr. Byrne's report, relied on heavily by the district court, was based on J.M.'s history and prior patterns of treatment progress. The record establishes that J.M. has not acted out sexually, has not had any sexual in nature rule violations, and has either completed

his sex offender treatment or made substantial progress since his last evaluation. While we are aware both Dr. Byrne and Dr. Benson expressed concerns over J.M.'s potential aggression issues, the record does not establish that J.M.'s propensity towards sexual violence is of such a degree as to pose a threat to others. *Tanner*, 2017 ND 153, ¶ 6, 897 N.W.2d 901. An individual may only be committed when the individual has serious difficulty controlling his or her sexually predatory behavior, making that individual a danger to others. *Nelson*, at ¶ 9; *J.M.*, 2006 ND 96, ¶ 10, 713 N.W.2d 518. On this record, the State failed to establish a nexus between J.M.'s limited rule violations and his likelihood of sexually reoffending. We conclude the district court's finding that J.M. is a sexually dangerous individual is clearly erroneous.

[¶19] Nevertheless, we are concerned about J.M.'s abrupt release from the State Hospital. J.M. has been separated from the public since 2001, serving a nearly five-year prison term before his commitment as a sexually dangerous person in 2005. While the impact of this sudden change on J.M. troubles the Court, our current law does not allow for an alternative result. As we stated in *In re J.G.*, "[o]ur frustration with the tension in the statutes cannot justify a result not supported by the evidence." 2015 ND 207, ¶ 14, 869 N.W.2d 108.

[¶20] Normally, less restrictive treatment plans, such as community placement, are used to assist patients with the transition back into everyday life. Determining the appropriate means of treatment is reserved for the executive director. N.D.C.C. § 25-03.3-13; *In re G.R.H.*, 2006 ND 56, ¶ 22, 711 N.W.2d 587. We cannot force community placement where it has not been petitioned for by the executive director. *In re Whitetail*, 2015 ND 206, ¶ 21, 868 N.W.2d 833. Nor can the courts place restrictions or requirements upon an individual once they are discharged from civil commitment because they are no longer a sexually dangerous individual as defined in N.D.C.C. ch. 25-03.3. *Id.* at ¶ 22.

7

[¶21]  We reverse the district court's order denying J.M.'s petition for discharge.

[¶22]  Gerald W. VandeWalle, C.J.
Jerod E. Tufte
Daniel J. Crothers

**McEvers, Justice, dissenting.**

[¶23]  I respectfully dissent.  The argument on appeal was that the State failed to meet its burden of proof of clear and convincing evidence that J.M. is likely to engage in further acts of sexually predatory conduct, has serious difficulty controlling his behavior, and poses any more of a threat than the typical recidivist.  We affirm a district court's commitment order unless it is induced by an erroneous view of the law, or we are firmly convinced the order is not supported by clear and convincing evidence.  *In the Interest of D.V.A.*, 2004 ND 57, ¶ 7, 676 N.W.2d 776.

[¶24]  The district court found J.M. was likely to engage in further acts of sexually predatory conduct based on Dr. Byrne's testimony and report, and Dr. Benson's determinations of risk, including the following evidence:

> Dr. Byrne's determination that [J.M.] is in the high risk to reoffend category based on his Static 99R score of 7, Dr. Byrne's testimony that [J.M.'s] Other Specified Paraphilic Disorder (polymorphously perverse) and his Antisocial Personality Disorder predisposes [J.M.] to act compulsively and to engage in future acts of sexual predatory conduct, the dynamic factors considered at pages 9-10 of Dr. Byrne's report, Dr. Benson's determination that [J.M.'s] score of 5 on the Static 99R which placed him in the Level IVA-Above Average risk range, his score of 7 on the Static 2002R placed [J.M.] in the Level IVB Well Above Average Risk category, and the results of the SRA-FV on which [J.M.] scored 2.80 which places him in the high risk range.

Pages 9-10 of the report referred to summarized reasons why Dr. Byrne thought J.M. is likely to engage in further acts of predatory conduct. For instance, according to Dr. Byrne, J.M.'s diagnosis of other specified paraphilic disorder (polymorphously perverse) indicates that individuals with that disorder tend to engage in ongoing recurrent and intense sexual fantasies, urges and behaviors involving a wide range of

sexual behavior which predisposes J.M. to engage in future sexually predatory conduct. In addition, Dr. Byrne opined that J.M.'s personality disorder adversely affects his ability to modulate the fantasies, urges, and behavior related to the sexual disorders. These pages of Dr. Byrne's report also summarize J.M.'s dynamic factors. While some of the factors weigh in J.M.'s favor or are neutral, a number of them show why he poses a high risk to sexually reoffend, including:

- Impulsive—*Partially Present:* [J.M.'s] rate of RBW's has decreased significantly but have not been eliminated. His RBW's show he is still not fully and consistently implementing his treatment concepts as he progresses through the treatment program.
- Poor Cognitive Problem Solving—*Partially Present:* As noted in the descriptions, [J.M.] appears to have the ability to do well in treatment but as he progresses he continues to act out in ways that result in his losing his treatment status. In addition, his writing with profanity and negativity toward his peers in his journal is also not a good solution to his problems in managing himself within the program.
- Negative Emotionality—*Present:* [J.M.] appears to harbor and cultivate resentments and blames others for his problems which continues to result in anxiety, frustration, and anger.
- Sex Drive/Sexual Preoccupation—*Partially Present:* [J.M.], after having been masturbating regularly, has now claims to have not had much masturbatory activity due to his religious changes. However, the possibility of his attempting to "look good" is also possibly present as well and it appears unlikely that he would go from regularly masturbating not virtually not doing so.
. . . .
- Deviant Sexual Preference—*Present:* [J.M.] has at least two prepubescent victims, has admitted to masturbating to prepubescent children while at NDSH. There has been no objective evidence of any treatment changes other that his self-report.
- Cooperation with Supervision—*Present:* [J.M.'s] RBW's (resident behavioral write-ups), while, reduced, still constitute significant rule breaking on his part and also his journal entries also represent a disdain for treatment.
. . . .

9

Thus, it is the undersigned professional's opinion that [J.M.] continues to demonstrate "serious difficulty" controlling his behavior that would likely be worse in a less restrictive environment.

[¶25] The district court also found the necessary nexus between J.M.'s condition and the danger he poses to others is linked to a serious difficulty in controlling his behavior, relying in part on pages 10-11 of Dr. Byrne's report. The court focused on Dr. Byrne's opinion that J.M.'s antisocial personality and psychopathic traits are still behaviorally present in the form of his RBW's and a concerning pattern of progress in treatment is followed by acting out resulting in him being demoted to Stage 1 treatment. Dr. Byrne opined J.M. is not adaptively managing his risk as he is granted more privileges and freedoms, and his acting out while in a secure setting gave concerns of an increased probability of acting out if he were given greater access to the community. It was Dr. Byrne's professional opinion that J.M. continues to demonstrate serious difficulty controlling his behavior that would likely be worse in a less restrictive environment. The district court also noted that Dr. Benson indicated that aggression continues to be an issue for J.M., but Dr. Benson did not believe it increased his likelihood to reoffend.

[¶26] There is sufficient evidence to justify the district court's findings that J.M. is a sexually dangerous individual and likely to engage in further acts of sexually predatory conduct.

[¶27] Lisa Fair McEvers
Jon J. Jensen

10