# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

2019 ND 67

In the Interest of William Joseph Carter

State of North Dakota,                                          Petitioner and Appellee

v.

William Joseph Carter,                                    Respondent and Appellant

No. 20180189

Appeal from the District Court of Stutsman County, Southeast Judicial District, the Honorable Cherie L. Clark, Judge.

AFFIRMED.

Opinion of the Court by Tufte, Justice.

Joseph K. Nwoga (argued), Assistant State's Attorney, and Frederick R. Fremgen (on brief), State's Attorney, Jamestown, N.D., for petitioner and appellee.

Tyler J. Morrow, Grand Forks, N.D., for respondent and appellant.

**Tufte, Justice.**

[¶1]    William Carter appeals from a district court order denying discharge from commitment as a sexually dangerous individual. On appeal, he argues the State failed to establish that he is likely to reoffend or that he has serious difficulty controlling his behavior. We affirm the district court's order.

I

[¶2]    Carter was convicted of gross sexual imposition in 2004. In 2007, the district court ordered Carter's commitment as a sexually dangerous individual to the Department of Human Services. In February 2017, Carter filed motions requesting a discharge hearing and appointment of an independent examiner. Dr. Erik Fox, the State's evaluator, filed a report in May and an addendum to that report in September. Dr. Fox's initial recommendation was for post community placement; however, the addendum rescinded that recommendation as a result of new information Dr. Fox received during the summer of 2017. Dr. Stacey Benson, the independent examiner, also filed a report. The discharge hearing was held March 19, 2018. On appeal, Carter argues the State failed to meet its burden to prove that he is likely to engage in sexually predatory conduct and that he has difficulty controlling his behavior.

II

[¶3]    This Court reviews "civil commitments of sexually dangerous individuals under a modified clearly erroneous standard of review." *Interest of Nelson*, 2017 ND 152, ¶ 3, 896 N.W.2d 923. We will affirm the district court order unless it is "induced by an erroneous view of the law, or we are firmly convinced the order is not supported by clear and convincing evidence." *Id.* "When reviewing the district court's order, this Court gives 'great deference to the court's credibility determinations of expert witnesses and the weight to be given their testimony.'" *Matter of Kulink*, 2018 ND 260, ¶ 3, 920 N.W.2d 446 (internal citations omitted). To be committed as a sexually

1

dangerous individual, a person must meet three statutory elements under N.D.C.C. § 25-03.3-01(8):

> (1) the individual has engaged in sexually predatory conduct, (2) the individual has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction, and (3) the individual's condition makes [the individual] likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.

*Nelson*, at ¶ 4. "In addition to the three statutory requirements, . . . the State must also prove the committed individual has serious difficulty controlling his behavior." *Id.* (quoting *Matter of Wolff*, 2011 ND 76, ¶ 7, 796 N.W.2d 644). The United States Supreme Court did not give the phrase "lack of control" a particularly narrow or technical meaning, nor is "inability to control behavior" demonstrable with mathematical precision. *Kulink*, at ¶ 4 (quoting *Kansas v. Crane*, 534 U.S. 407, 412-13 (2002)). Although not mathematically precise, the proof of "inability to control behavior . . . must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, at 413. Thus, a "connection [must be found] between the disorder and the individual's inability to control" his actions. *Nelson*, at ¶ 4.

[¶4]    The North Dakota statute "incorporates the *Crane* requirement in its definition of sexually dangerous individual." *Kulink*, 2018 ND 260, ¶ 5, 920 N.W.2d 446. We interpret the definition to require "proof of a nexus between the requisite disorder and dangerousness to encompass proof that the disorder involves serious difficulty in controlling behavior and suffices to distinguish a dangerous sexual offender whose disorder subjects him to civil commitment from the dangerous but typical recidivist in the ordinary criminal case." *Id.* The State must prove each of the three elements plus the *Crane* factor by clear and convincing evidence. *Id.* Only element three and the *Crane* factor are at issue here.

III

2

[¶5] This Court has "recognized the phrase 'likely to engage in further acts of sexually predatory conduct' under N.D.C.C. § 25-03.3-01(8), 'means the individual's propensity towards sexual violence is of such a degree as to pose a threat to others.'" *Interest of Tanner*, 2017 ND 153, ¶ 6, 897 N.W.2d 901 (quoting *Matter of Rubey*, 2011 ND 165, ¶ 5, 801 N.W.2d 702).

[¶6] In its discussion of element three, the district court found that both Carter's Pedophilic Disorder and Anti-Social Personality Disorder contribute to a likelihood to engage in sexually predatory conduct in the future. Dr. Fox and Dr. Benson diagnosed Carter with pedophilic disorder, with the specifier "attracted to girls, nonexclusive, but not limited to incest." The doctors testified pedophilic disorder is a lifelong condition that never goes into remission. Both doctors found Carter to have antisocial tendencies, but only Dr. Benson diagnosed Carter with Anti-Social Personality Disorder. Dr. Fox testified Carter's antisocial personality behavior has not changed in the last twelve years, but because he is a more conservative scorer, he did not make the same diagnosis. Dr. Benson also found Carter meets the gender dysphoria requirements and has a history of alcohol abuse. Dr. Fox found grievance thinking partially present in Carter, which indicates he denies accountability to some degree. Dr. Fox scored Carter a 22.1 on the PCL-R (the Hare Psychopathy Checklist), placing him at the 40th percentile of prisoners. Dr. Benson scored Carter higher, at 28.2, but still within the moderate range.

[¶7] Carter's history includes several incidents prior to this review period that provide context for the experts' assessment of Carter's recent behavior. While incarcerated in the penitentiary, Carter possessed photographic cutouts of adolescent and prepubescent girls, some of which he cut out of a newspaper. Dr Fox testified that Carter's denial of using these for masturbatory stimuli was not credible. At the state hospital in 2014, Carter masturbated to a non-pornographic photo of his roommate's nine-year-old niece. The girl depicted was approximately the same age as Carter's index offense victim. Both the incident with the cutouts and the incident with the

3

photo of his roommate's niece could have jeopardized Carter's safety if other prisoners had discovered them.

[¶8] Within this review period, in the summer of 2017, Carter had a 2015 school uniforms catalog which included numerous images of prepubescent children modeling school uniforms. The children depicted in the catalog were similar to the girl in the photo which Carter had used as stimulus while in prison. Additionally, Carter possessed cutouts of young adult women tucked within the catalog: one in a "sports jersey top" and one in an "underwear or bikini top." Carter claims he was allowed to have the catalog.

[¶9] Dr. Fox had originally recommended community placement. Although Dr. Fox was initially not concerned with the cutouts, the incident with the catalog, along with other rule violations discussed below, led Dr. Fox to change his recommendation when he wrote the addendum report. Dr. Benson also expressed concern that possession of the catalog showed poor judgment on Carter's part. The district court stated that this incident in 2017 was dispositive to its decision to continue commitment.

[¶10] There were other rule violations in July 2017, between Dr. Fox's initial report and addendum. Carter bought a women's two-piece swimsuit without waiting for a response to his request for permission to purchase it. The two pieces were different sizes; testimony indicated Carter purchased them in a rush because he didn't want his State escort to find out. Also, Carter possessed more money at once than he was allowed to have. Dr. Fox was somewhat concerned with the swimsuit purchase in connection with the catalog possession, especially when he learned that Carter had been in the Walmart female undergarments section two months prior to purchasing the swimsuit. Dr. Fox believed it to be a progression from being in the wrong section of Walmart, to purchasing the swimsuit without approval, to it being the wrong size. Dr. Fox testified that after Carter's extensive training, he should have been wiser than to be in the undergarments section.

[¶11]   Dr. Benson agrees there is concern that Carter did not follow the rules and wait for approval before buying the swimsuit. However, she did not see it as "indicative of potential continuation of [Carter's] pedophilic fantasies." The catalog was of greater concern to her than the rule violations: "even giving [Carter] the benefit of the doubt, somebody who has been in treatment and who is advanced as far as he has, it showed . . . very poor judgment for him to keep a magazine of that nature given the fact that he has masturbated to images of children before and that could be a risky situation for him." Although she expressed concern, the summer 2017 incident did not alter Dr. Benson's recommendation.

[¶12]   Dr. Fox testified that on the Static-99R evaluation, an assessment on risk to reoffend, Carter achieved a score of 5. Dr. Fox noted that 85% of sex offenders score lower, 7.4% score the same, and 7.6% score higher. This places Carter at approximately three times the potential recidivism rate of the typical sexual offender who has a median score of 2. There are two categories that further refine the Static-99R: "Routine Norms" and "High Risk/Needs Norms."  To determine which category to place Carter into, Dr. Fox used Carter's SRA-FV score of 3.38, which indicated he had a "high density for external risk factors" and placed Carter's Static-99R results in the high risk category. People who fall into this group are found to sexually reoffend within five years at a rate of 21.2%, and within ten years at 32.1%. Dr. Fox believes Carter is likely to reoffend because his sexual compulsivity is present to the point of risking his opportunity to be released from civil commitment by violating the rules while under review for release.

[¶13]   Dr. Benson does not find Carter likely to reoffend, but she testified that neither is he near the level of a non-offender. Dr. Benson found Carter to have a score of 5 on the Static-99R, placing Carter in the above-average category. On the SRA-FV, Dr. Benson scored Carter at 3.22, a score very close to Dr. Fox's, but did not place Carter in the high risk category because of recent criticism that the high risk category has been receiving. Dr. Benson found Carter to be in the group that has a 15.2% chance to reoffend sexually within five years. Carter placed himself at a 20% chance to

5

reoffend. Although juvenile-only sex offenders typically have a lower recidivism rate than adult offenders, Carter is not comparable to other juvenile-only sex offenders because unlike most juvenile offenders, he has Pedophilic Disorder. Dr. Benson agreed most juvenile sex offenders do not have a paraphilia disorder. The district court was persuaded by Dr. Fox's testimony and reasoning in using the high risk category. It found Carter had a likelihood to engage in further acts of sexually predatory conduct. We conclude there was clear and convincing evidence supporting the district court's finding that Carter has a likelihood to engage in further acts of sexually predatory conduct.

IV

[¶14]  To satisfy the *Crane* factor, the "individual must be shown to have serious difficulty controlling his behavior." *In re Hehn*, 2008 ND 36, ¶ 19, 745 N.W.2d 631. However, the evidence or conduct showing the "individual's serious difficulty in controlling his behavior" need not be of a sexual nature. *Wolff*, 2011 ND 76, ¶ 7, 796 N.W.2d 644.

[¶15]  The district court found the incident with the school uniforms catalog "particularly concerning" and noted that this evidences a pattern of behavior because Carter has done similar things previously, showing he has a "serious difficulty in controlling his behavior and managing his compulsions." The court further noted the fact that Carter was willing to jeopardize his release by collecting and possessing the images strongly suggests a lack of control over compulsions at the current time. The district court ultimately found Carter has "not demonstrated that he would be able or willing to control his behavior if he were to be released from the commitment." Dr. Fox felt all the components of the summer 2017 incident were cause for concern regarding Carter's ability to control himself. He noted Carter engaged in risky behavior while on the "verge of being in the community." The buying of the swimsuit indicated to Dr. Fox there was "thought and planning and recognition of the inappropriateness of the behavior . . . [meaning] he wasn't controlling his behavior, and [Carter] was [a] higher risk than . . . [Dr. Fox] initially thought," and therefore not

6

ready for community placement. Dr. Benson found it concerning that Carter requested permission to purchase the swimsuit, yet he "didn't wait." This was a rule violation but also a demonstration of Carter's lack of control. The court noted the purchase of the swimsuit was not necessarily sexual, but it does show a lack of impulse control. We conclude the record contains clear and convincing evidence supporting the district court's finding that Carter has serious difficulty in controlling his behavior.

V

[¶16]   There is clear and convincing evidence that the three statutory elements and the *Crane* factor were satisfied. We affirm the district court's order denying discharge.

[¶17]   Jerod E. Tufte
       Daniel J. Crothers
       Lisa Fair McEvers
       Jon J. Jensen
       Gerald W. VandeWalle, C.J.